[Civ. No. 42262. Second Dist., Div. Three. Aug. 21, 1973.]

JEWELL BOWER, Plaintiff and Respondent, v.
ROY-AL CORPORATION, Defendant and Appellant.

**COUNSEL**

Humphreys, McDonald & Russell and George McDonald for Defendant and Appellant.

Bailey & Block and Donald V. Block for Plaintiff and Respondent.

**OPINION**

**THE COURT.**—This matter comes to the court on certification from the appellate department of the superior court pursuant to rule 63(a), (b) and (c), California Rules of Court.

The "Engrossed Settled Statement on Appeal" reveals that plaintiff Jewell Bower brought suit against defendant Roy-Al Corporation, individually and doing business as Contract Insurance Underwriters of Seaboard Life Insurance Company of America, to recover on a credit life and disability policy issued by defendant.

The case was tried without a jury and taken under submission by the court. On June 16, 1972, judgment was entered in favor of defendant and against plaintiff. On June 30, 1972, plaintiff served and filed his notice of intention to move for a new trial. On August 15, 1972, the trial court denied plaintiff's motion for new trial, but ordered the judgment be entered in favor of plaintiff and against defendant in the sum of $3,240, with interest in the amount of $737.10.

Defendant appealed from the judgment and the appellate department of the superior court rendered its decision reversing the judgment with instructions to the trial court to render judgment for defendant. Upon plaintiff's timely motion, the appellate department of the superior court certified the case to this court for the reason that "it appears necessary to settle an important question of law."

The facts giving rise to this controversy are as follows. On April 29, 1966, plaintiff purchased an automobile from Tom Carrell Chevrolet. As a part of that transaction plaintiff was offered, and agreed to take, the credit life and disability insurance policy which is the subject of the present controversy. Under the contract that plaintiff entered into with Tom Carrell Chevrolet, plaintiff obligated himself, over a period of 36 months, to pay installments in the amount of $90 per month for the newly acquired automobile. Plaintiff's total obligation on the automobile was $3,240.

The insurance policy provided the following coverage: "This policy provides indemnity in case of death and for total and continuous disability caused by accidental bodily injury or by sickness in the amounts, for the periods and to the extent herein limited and provided." The indemnity provided for was the $90 monthly car payments up to the total contractual liability of $3,240. The effective date of the policy was April 29, 1966. The policy provided that: " 'Sickness' as used in this policy means sickness, illness or disease of the Insured which originates after the Effective Date hereof and while this policy is in effect and which results in total and continuous disability which commences while this policy is in effect. The words 'sickness' or 'illness' or 'disease' as used herein shall be construed to mean one and the same thing." In the part of the policy entitled "Exclusions" it was provided in pertinent part as follows: "No disability benefits shall be payable hereunder for any such disability which is caused or contributed to by: . . . (e) accidents occurring or disease contracted prior to the Effective Date of this policy . . . ."[1]

In acquiring this policy of insurance, plaintiff was not asked to complete an application therefor or to submit to a medical examination.

For a considerable period of years prior to April 29, 1966, plaintiff had worked as a lineman for the Los Angeles City Department of Water and Power and in the course of that work had regularly climbed up and down power poles. For a number of years prior to April 29, 1966, plaintiff's family doctor had been Milton Lerner, M.D. For approximately a period of 18 months prior to April 29, 1966, Mr. Bower had seen Dr. Lerner from time to time and had complained of pain in his legs. He also had complained of pains in his back, neck and shoulders, and Dr. Lerner had prescribed vitamin B-12 and cortisone. Plaintiff testified that the aches and pains for which he had been seeing Dr. Lerner had never interfered in any way with his ability to perform his job, which consisted primarily of climbing telephone poles all day, every day.

Approximately three weeks after the effective date of the policy, while plaintiff was working at the top of a telephone pole, plaintiff's legs "went to sleep." Plaintiff testified that this was the first time he had experienced this condition in his legs. He contacted Dr. Lerner about this condition

---

[1] Subsequent to the effective date of the policy involved in the instant case, the Department of Insurance promulgated a regulation respecting credit life and disability insurance policies (Cal. Admin. Code, tit. 10, § 2248.9) entitled "Provisions of Policies and Certificate of Insurance: Disclosures to Debtors." Subsection C 2.f. of said section 2248.9 is concerned with exclusion of coverages for pre-existing conditions. The original version of the section became effective August 13, 1967. (See Cal. Admin. Register 67, No. 28.)

and actually went to see Dr. Lerner on approximately May 24, 1966. Dr. Lerner referred plaintiff to Peter B. Samuels, M.D., a specialist in peripheral vascular disorders, and plaintiff saw Dr. Samuels that same day. Dr. Samuels arranged for plaintiff to be hospitalized and on June 6, 1966, plaintiff underwent surgery which was performed by Dr. Samuels. Plaintiff testified that he "had never been able to work since the surgery of June 6, 1966."

The trial court considered a letter dated June 6, 1967, written by Dr. Lerner which stated: "Mr. Jewell H. Bower has been a patient in this office since January, 1965. His chief complaint was pains in his legs. His condition was diagnosed as arthritis and he was treated for this condition. [¶] In May, 1966, Mr. Bower complained of claudication[2] and it was at this time that evaluation and consultation revealed evidence of involvement of both legs with diminishing right femoral pulses and absent posterior tibial pulsation, bilaterally. Mr. Bower was referred to Dr. Peter Samuels and he made the diagnosis of athero sclerosis obliterans with right aorta iliac stenosis and left femoro-popliteal obstruction."

During the course of the trial defendant produced as an expert witness in the field of vascular disorders Dr. Peter B. Samuels, the physician who operated on plaintiff. The engrossed settled statement states that "the Court, in reaching its decision [in favor of defendant] dated June 16, 1972, believed Dr. Samuels' testimony. . . ."

Dr. Samuels testified that he first saw plaintiff on May 24, 1966, as a patient referred by Dr. Lerner. Dr. Samuels testified that he took a detailed history from plaintiff and that plaintiff told him the following: "[T]hat for about the last two years he (the plaintiff) had not been able to walk for more than one block without stopping and resting. [Plaintiff] . . . also told Dr. Samuels that the condition had been continuously growing worse, somewhat more on the left than on the right side. [Plaintiff] . . . also told the physician that his feet had tingling and numbness, and that he (. . . [plaintiff]) particularly had problems with cramping of his legs in walking up hill. The patient also told the physician that his pain kept him (. . . [plaintiff]) awake at night. Dr. Samuels testified that he did not have detailed notes as to what . . . [plaintiff] told him. . . ."

---

[2]The meaning of "claudication" is as follows: "claudication . . . Limping or lameness, intermittent c., a complex of symptoms characterized by absence of pain or discomfort in a limb when at rest, the commencement of pain, tension, and weakness, after walking is begun, intensification of the condition until walking becomes impossible, and the disappearance of the symptoms after a period of rest. The condition is seen in occlusive arterial diseases of the limbs, such as thrombo-angiitis obliterans." (Dorland's Illustrated Medical Dict. (24th ed. 1965) p. 313.)

Dr. Samuels testified respecting certain tests he performed upon plaintiff on May 24, 1966. "Dr. Samuels concluded, on the basis of the tests, plus the history, that . . . [plaintiff], for about 18 months to two years prior to the time that he (Dr. Samuels) saw him, had been suffering from 'intermittent claudication' caused by vascular insufficiency to the lower extremities, particularly on the left side. Intermittent claudication was a cramping of the muscles in the lower extremities of a patient when the vascular system was incapable of supplying sufficient amounts of blood to the lower extremities. Intermittent claudication, according to Dr. Samuels, was diagnostic of vascular insufficiency in the legs."

On June 1, 1966, Dr. Samuels performed another test on plaintiff. As a result Dr. Samuels "concluded that . . . [plaintiff], as of May 24, 1966, was suffering from (1) right aorto-iliac stenosis; (2) left femoral popliteal obstruction; and (3) atherosclerosis obliterans. He also felt, as a matter of reasonable medical probability, that all of these conditions had existed for at least two years prior to the time he first saw . . . [plaintiff]."

On June 6, 1966, surgery was performed on plaintiff and at that time Dr. Samuels' earlier diagnosis was confirmed. It was Dr. Samuels' opinion that "the total and continuous disability of . . . [plaintiff] directly stemmed from the vascular problems . . . which were confirmed on June 6, 1966, at the time of surgery."

Other portions of Dr. Samuels' testimony were summarized as follows: "Dr. Samuels also testified that the condition of blockage of the arteries he indicated at the time of . . . [plaintiff's] examination would not necessarily be a gradual, progressively worsening condition, but might well occur suddenly. Dr. Samuels further testified that other conditions, such as a Charley horse, of which athletes frequently complain, could cause pain in the legs. When asked by Mr. Bower's counsel whether, in his opinion, Mr. Bower could have worked climbing telephone poles for a period of time as long as ten days, with his legs in the condition that Dr. Samuels saw on May 24, 1966, Dr. Samuels testified no."

Under that part of the engrossed settled statement on appeal entitled "Court's Findings," the following appears: "On June 16, 1972, the Court, after considering the foregoing evidence, together with the stipulations of the parties and the data contained within certain exhibits offered and received in evidence in the course of trial, concluded that the condition which caused Mr. Bower's total and continuous disability did originate prior to the policy inception date of April 29, 1966. . . . The Court was and is satified that Mr. Bower had suffered from a condition of atherosclerosis and leg pains for a period of approximately 18 months prior to the policy

inception date of April 29, 1966. The Court also felt, and feels, that plaintiff's disease was manifested outwardly for some period of time prior to the policy date, although the reason for the manifested symptoms was incorrectly diagnosed by the family physician, Milton Lerner, M.D. The Court also found, and finds, that plaintiff's total and continuous disability was caused by the vascular insufficiency of his lower extremities. [¶] The Court, on June 16, 1972, handed down its verdict, and gave judgment in favor of defendant and against plaintiff after finding that the exclusion barring benefits in the event the disability-causing disease originated prior to the policy inception date, in the circumstances, was to be given effect. [¶] The Court later concluded that on the basis of the *Fohl* case and the *Hovis* case, after hearing and considering the motion for new trial, it had made a mistake of law, and that the legal origin of the disease as distinguished from the medical origin of the disease was after the inception date of the policy."

■ We have concluded that the trial court's ultimate decision was correct. Apparently only three California decisions have dealt with the interpretation of insurance policy clauses limiting coverage for either medical or disability benefits to sickness originating while the policy is in force. We have sought guidance from decisions of other jurisdictions as well, and it appears that a general rule exists for the interpretation of such clauses and that the aforementioned California cases, which will be discussed herein, follow the general rule. ■ The general rule is succinctly stated in an annotation on the subject in 53 American Law Reports 2d 686, at page 689, as follows: "It is generally recognized that provisions in a health or hospital insurance policy requiring that the illness or disease from which the assured suffers originate a specified time after the date of the policy to be within the policy coverage are strictly construed against the insurer, and the illness, disease, or disability will ordinarily be deemed to have its inception when it first becomes manifest or active or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease. [Fn. omitted.] [Citations from numerous jurisdictions.] [¶] Thus, even though the medical cause may have antedated the policy, recovery would be allowed, under the general rule set forth above, where the disease did not manifest itself until after the policy period of liability exemption."

In *Fohl* v. *Metropolitan Life Ins. Co.*, 54 Cal.App.2d 368 [129 P.2d 24], defendant insurer issued a supplemental insurance agreement covering total and permanent disability in connection with a life insurance policy. The supplemental agreement provided: ". . . if while the above numbered [life insurance] policy is in full force and effect, and before default in

payment of any premium, the company receives due proof that the insured, *as the result of injury or disease occurring and originating after the issuance of the policy,* has become totally and permanently disabled so . . . the company will allow the following benefits . . . ." (Italics added.) The evidence in *Fohl* showed that the insured suffered from syphilis prior to issuance of the disability policy but that he continued to be employed and active until he suffered his first epileptic seizure in December of 1928, some seven years after issuance of the policy. Although the insured's condition improved and he became reemployed, he finally was committed to the Napa State Hospital in June of 1931. In reversing the trial court's decision in favor of the defendant insurer the appellate court stated (54 Cal.App.2d at pp. 378-379): "Though the insured suffered from syphilis in 1920, he nevertheless continued to work, and was gainfully employed until stricken with his first violent attack of epilepsy in December, 1928. In other words, the disease which caused the insured's disability first became manifest or active in 1928, although he was again able to work from June, 1929, until 1930, when he became violent and his condition so bad that it was necessary to confine him in June, 1931. From September, 1930, he was unable to work except for a three-week period in December of that year. Whatever may have been the insured's condition prior to and at the time of the issuance of the policy, it was certainly, according to the evidence, a latent condition which failed to manifest itself so far as disability was concerned for some eight years after the issuance of the policy. As was said in *Reiser* v. *Metropolitan Life Ins. Co.,* 262 App.Div. 171 [28 N.Y.S. 2d 283], 'A disease does not occur or originate within the meaning of the policy until it becomes a disease in the general acceptation of that term.' In other words, the beginning of the insured's disability dates from the time when the disabling disease first manifested itself or became acute, and not from the time when the medical cause of the disease may have originated or begun. (*Provident Life & Acc. Ins. Co.* v. *Jemison,* 153 Miss. 53 [120 So. 180, 182].) Whatever syphilitic infection may have been in the body of the insured when he received the insurance policy, according to the evidence it certainly had not manifested itself up to that time, so far as any disability was concerned. It did not disable him from work, as the record shows without contradiction that he continued in his employment and paid premiums on the policy for years after its issuance. (*Smith* v. *Benefit Assn. of Ry. Employees* (1932) 187 Minn. 202 [244 N.W. 817, 819].) To us it appears to be the better rule that even though the medical cause of the disease which resulted in the incompetent's disability may have antedated the issuance of the policy, where, as here, the disease did not manifest itself for years after such issuance, the plaintiff is entitled to the disability benefits under the policy."

It can reasonably be argued that the *Fohl* case is factually distinguishable from the case presently before this court in that the disabling disease in *Fohl*, that is, epilepsy or mental disease, did not originate prior to the policy date because it was a new and different disease from the syphilis which was the medical cause thereof. However, the importance of *Fohl* is that it clearly appears to follow the general rule which states that sickness originates when it becomes manifest or acute rather than at the time of its medical cause or origin.

The other two California cases interpreting similar insurance policy provisions concerned policies covering hospital and medical expenses. They are *Skroopka* v. *Royal Indem. Co.*, 132 Cal.App.2d Supp. 910 [283 P.2d 111], and *Cimino* v. *Reserve Life Ins. Co.*, 181 Cal.App.2d Supp. 840 [5 Cal.Rptr. 850]. Although the appellate department of the superior court in its opinion indicated its belief that these two cases might express conflicting viewpoints, we believe that they are not in conflict and that they are consonant with the general rule of interpretation to which reference is made hereinabove.

In *Skroopka* v. *Royal Indem. Co., supra,* 132 Cal.App.2d Supp. 910, the loss sought to be recovered was the expense incurred in the medical and surgical treatment of plaintiff's wife. The sole question presented was whether the treatment was for a sickness contracted after 30 days from the effective date of the policy. The effective date of the policy was September 19, 1952. At the time of trial Mrs. Skroopka was 47 years old. Since the time Mrs. Skroopka was 20 years old she had had nodules or lumps in her breasts which, just before her menstrual period, would swell and become painful. From time to time she had consulted physicians about this condition but had received no suggestions for medical care or treatment. In May 1952, Mrs. Skroopka consulted Dr. Sperling who examined her breasts, noting his impression that she probably had chronic cystic mastitis. On September 2, 1952, he examined her again and noted that he would watch the situation carefully, having operated on her sister for breast cancer a week earlier. On December 26, 1952, Dr. Sperling decided to operate "to be sure about it." The operation revealed no cancer and the ultimate diagnosis was adenosis fibrosis. In reversing the judgment for plaintiff, the court stated (132 Cal.App.2d Supp. at p. 913): "If the 'sickness' was not that manifested by the presence of the nodules or lumps in the breasts (ultimately ascertained to be adenosis fibrosis)—which motivated the doctor to resort to surgery—what was it?" Following the general rule, although not expressly so stating, the court found that the only manifestation of the sickness which motivated Mrs. Skroopka's surgery was the lumps in her

breasts which had existed since she was 20 years old. Thus the sickness was clearly manifest prior to the effective date of the policy.

*Cimino* v. *Reserve Life Ins. Co., supra,* 181 Cal.App.2d Supp. 840, is not in conflict with *Skroopka.* In *Cimino* the insurance policy also covered costs of hospitalization and surgical treatment and limited coverage to costs "resulting from sickness the cause of which originates while this policy is in force and more than fifteen (15) days after the effective date hereof . . . ." The effective date of the policy was March 11, 1958. On May 22, 1958, plaintiff's son, Prospero, was hospitalized and underwent surgery for osteomyelitis. On May 17, 1958, Prospero experienced a high fever, a sharp pain in his right hip, and was unable to straighten out his right leg. Over a period of two years prior to May 1958, Prospero had felt the same pain in his right leg about once every two months and during the month prior to his hospitalization the pain had occurred more often. He had not consulted a doctor until May 20, 1958. During the year prior to Prospero's hospitalization he had attended school regularly, played on the high school football team, and played basketball and baseball. An expert medical witness testified that the deteriorating condition of the bone had been taking place from eight to twelve months prior to Prospero's hospitalization and that it was probable that the pain Prospero had experienced was due to the existence of osteomyelitis.

In affirming the trial court's judgment for plaintiff the appellate court stated (181 Cal.App.2d Supp. at pp. 842-843): "Defendant contends that the rule in regard to latent or undisclosed disease is that 'a sickness should be deemed to have its inception at the time that it first manifested itself or became active, or when sufficient symptoms existed to allow a reasonably accurate diagnosis of the case. . . .' (53 A.L.R.2d 688; see also *Fohl* v. *Metropolitan Life Ins. Co.,* 54 Cal.App.2d 368, 379 [129 P.2d 24]; *Reiser* v. *Metropolitan Life Ins. Co.,* 262 App.Div. 171 [28 N.Y.S.2d 283, 286].) Defendant argues that Prospero's sickness should accordingly be deemed to have had its inception at the time it first manifested itself in the pains and spasms, and that therefore it must be considered as being within the exclusionary clause of the policy.

"In the Reiser case, *supra,* the court stated: 'A disease "occurring and originating" after the issuance of a policy of disability insurance means a disease or infirmity so considerable or significant that it would be characterized as such in the common speech of men. (*Silverstein* v. *Metropolitan Life Ins. Co.,* 254 N.Y. 81, 84 [171 N.E. 914].' In the case of *Reserve Life Ins. Co.* v. *Lyle* (Okla.) 288 P.2d 717 [53 A.L.R.2d 682], an action involving the interpretation of a policy identical to the one

presented here, the court held (at pp. 719, 720): 'The insuring clause of the instant policy declares a positive liability for the expense of hospital confinement "resulting from sickness," with limitation or exclusion expressed in these words, "the cause of which originates while this policy is in force and more than fifteen days after the date hereof." The language of the insuring clause does not explicitly state an exception or exclusion of liability in a case where the insured was then infected or affected with a specific or particular disease or disability, but declares a liability "resulting from sickness." . . . The expression "hospital confinement resulting from sickness" connotes something more than mere diseased condition or ill health. It speaks of an active state of illness or condition which manifests itself as the cause of hospital confinement.'

"Moreover, as was stated in *Milam* v. *Norwich Union Indemnity Co.*, 107 W.Va. 574 [149 S.E. 668, at 669]: 'The policy specifies sickness contracted; not disease, malady or ailment contracted. While the word "sickness" is technically synonymous with such words as "disease," it is popularly differentiated in this way: One is not ordinarily considered sick who performs his usual occupation, though some organ of the body may be affected; he is regarded as sick when that diseased condition has advanced far enough to incapacitate him. "Sickness is a condition interfering with the usual avocations." (Citing cases.) Terms used in a health policy should be considered from the standpoint of popular acceptation and not in the light of scientific definition. . . .'

"We find the reasoning of the *Lyle* and *Milam* decisions, *supra*, persuasive and applicable to the instant case. The trial court could reasonably have concluded from the evidence presented that although Prospero was affected with a condition of osteomyelitis during the period before the policy took effect, this infection was not such as would interfere with his normal activities."

*Cimino* is factually similar to the case presently before this court. Although in *Cimino* Prospero had experienced some pain in his leg for two years prior to his hospitalization, it had not interfered with his normal activities. Distinctive symptoms, namely, a high fever and inability to straighten out his leg, caused Prospero to seek the medical aid which resulted in the correct diagnosis of his condition.

Similarly, in the case presently before this court plaintiff had experienced pain in his legs for "approximately a period of 18 months prior to April 29, 1966." While this pain had prompted plaintiff to seek medical advice, it had not interfered with his normal employment as a telephone lineman. Again, it was a distinctive symptom, namely, numbness

in plaintiff's legs or a feeling, as he described it, that his legs had gone to sleep, which prompted his physician to refer plaintiff to a vascular specialist who correctly diagnosed plaintiff's illness.

Plaintiff was afflicted with atherosclerosis.[3] Dr. Samuels testified that "as a matter of reasonable medical probability" the disease had been present in plaintiff for a period of two years prior to the issuance of the policy. Whatever stage to which the disease had progressed on the effective date of the policy, it is clear from the evidence that it had in no way interfered with plaintiff's employment as a telephone lineman. Dr. Samuels also testified that "the condition of blockage of the arteries he indicated at the time of . . . [plaintiff's] examination would not necessarily be a gradual, progressively worsening condition, but might well occur suddenly." Dr. Samuels expressed the opinion that plaintiff could not have climbed telephone poles in connection with his work for a period of time as long as 10 days with his legs in the condition in which he saw them on May 24, 1966.

In a similar case, *United Insurance Company of America* v. *Wall* (1961) 233 Ark. 554 [345 S.W.2d 927], the plaintiff became totally and permanently disabled as a result of arteriosclerosis. The policy, issued on June 3, 1957, provided coverage for ". . . loss of time commencing while this policy is in force, from sickness *originating more than thirty days after the policy date*." (Italics added.) The plaintiff became disabled on January 23, 1958. The attending surgeon testified ". . . that, according to the history Mr. Wall gave him, the circulatory ailment had been in existence in his right leg for approximately eighteen months before January 1958, and in his left foot for approximately one and one-half months before that date." (345 S.W.2d 927 at p. 929.) In affirming a judgment for the plaintiff the appellate court stated (345 S.W.2d at p. 929): " '. . . the weight of authority is that the sickness should be deemed to have had its inception at the time it first manifested itself or became active, or when sufficient symptoms existed to allow a reasonably accurate diagnosis of the case, so that recovery can be had, even though the disease, germs or infection was present in the body prior to the excluded time, if the condition was latent, inactive, and perhaps not discovered.'

---

[3]Atherosclerosis is defined in Stedman's Medical Dictionary (22d ed. 1972) at page 123, as follows: "atherosclerosis. Nodular sclerosis; arteriosclerosis characterized by lipid deposits in the intima, irregularly distributed in large and medium-sized arteries. The lipid deposits are associated with fibrosis and calcification, and are almost always present to some degree in the middle-aged and elderly. Severe a. leads to reduction of the arterial luman and predisposes to thrombosis. The resulting ischemic manifestations include angina pectoris and myocardial infarction, strokes, intermittent claudication and gangrene of the lower extremeties, and some cases of renal hypertension."

"The fact that no reference was made to the presence of arteriosclerosis in the reports of the doctors who had examined Mr. Wall is a strong indication that the disease had not manifested itself at that time sufficiently to indicate a reasonable diagnosis. According to the testimony of the surgeon, practically everyone has arteriosclerosis in some degree but few ever have it as severely as appellee. Therefore, the fact that appellee had experienced some symptoms before the policy was issued was no indication that the disease would advance to a stage causing total disability."

In *Jackson* v. *Pacific Mutual Life Insurance Co.* (Mo.App. 1957) 308 S.W.2d 291, the plaintiff sought to recover hospital charges under a "health and accident" policy for treatment of an aneurysm of the aorta brought on by arteriosclerosis. The defendant insurer sought to prove that plaintiff's illness was within the scope of a clause excluding coverage for a disease contracted prior to the date of the policy which was March 1, 1955. The evidence showed that the plaintiff had suffered intermittently from aches and pains in the lower back for some three years prior to July 1955, when the aneurysm was discovered by X-ray. There was also expert medical opinion evidence that the aneurysm existed prior to March 1, 1955, and that plaintiff's back pain was caused by the aneurysm. The appellate court, in discussing the general rule of interpretation set forth in 53 American Law Reports 2d 689, stated (308 S.W.2d at pp. 293-294): "In Webster's New International Dictionary, Vol. II, at page 1496, the word 'manifest' is defined as evident to the senses, especially to the sight; apparent; . . . not obscure or hidden. It means open, clear, visible, unmistakable, indubitable, indisputable.

"The evidence here fails to show that plaintiff's aneurysm indisputably and clearly existed prior to March 1, 1955. The medical evidence was all to the effect that it was not discoverable by ordinary surface examination, by palpation, even as late as July 1. True there was medical *opinion* evidence to the effect that it probably existed as early as January, 1955. But that testimony was largely based on X-rays taken in July, which was related back to the lower back pain suffered by plaintiff in January. Dr. Klein made no diagnosis of aneurysm on July 1, although he was told about the back pains and examined the patient. The testimony was to the effect that a correct diagnosis in this case could not have been made except by X-ray; and that lower back pains may result from many causes. Indeed, that is a fact commonly known to laymen.

"The aneurysm in this case *may* have been present prior to March 1st; but it was not manifest to anyone until it was discovered in July by X-ray. Not until then was it clearly shown to exist."

In *Hovis* v. *Industrial Hospital Association* (1967) 71 Wn.2d 169 [426 P.2d 976], the plaintiff sued defendant insurer on a major medical policy to recover the costs of certain medical treatment and surgery. The policy was issued to the plaintiff in October 1961, and provided coverage for "Those physical illnesses, unless specifically excluded, which become manifest or have their original date of onset after Membership hereunder has been continuously effective for thirty or more days."

The pertinent facts are set out in the opinion as follows (426 P.2d at p. 977): "In 1962, while living in California, respondent went to San Francisco for further medical examination and treatment. His symptoms were neither new nor different than he had had for the past three to five years. He was troubled with cramps in his legs, pain in his hips and he had difficulty in walking any distance.

"When examined by a vascular specialist in San Francisco, it was found that respondent had been suffering from 'severe and progressive claudication involving both lower extremities' and that his symptoms had been progressive over the past five years. The expert testified that if respondent had been examined by a vascular specialist five years before, this condition would have been discovered, but not otherwise."

In deciding the issue of coverage in favor of the insured, the trial judge in *Hovis* stated (426 P.2d at p. 977): "I don't think there can be any doubt but what the plaintiff is entitled to recover. To adopt any other rule would make this type of coverage substantially worthless. When the company doesn't require a medical examination as a condition precedent it would put the burden upon the insured to have his own medical examination, at his own risk, and I don't think that's the intention of these policies at all."

In affirming the trial court's decision the appellate court in *Hovis* stated (426 P.2d at p. 977): "We agree with the trial court that a condition does not become manifest until it is known. And the evidence is clear that until respondent was examined by a vascular expert, the fact that he had this condition could not be known. To be so examined was not a responsibility resting on respondent."

The limiting language of the policy under consideration in *Hovis* was different from that employed in the policy presently before this court. In *Hovis* the policy covered illness "which becomes *manifest* . . . after Membership hereunder has been continuously effective for thirty or more days." In the instant case sickness is defined as "sickness, illness or disease of the Insured which originates after the Effective Date hereof and while this policy is in effect and which results in total and continuous disability which commences while this policy is in effect." The *Hovis* case is not for that

reason inapposite here because, as we have noted, the general rule is that a sickness, illness or disease originates for purposes of such a limiting clause "when it first becomes manifest or active or when there is a distinctive symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease." (Annot., 53 A.L.R.2d 686, *supra,* at p. 689.) However, in order to affirm the trial court's decision herein we do not feel compelled to follow *Hovis* and hold that under the terms of this policy a sickness originates only when it is known. Rather, we hold that in accordance with the general rule and the cases reviewed herein plaintiff's atherosclerosis originated under the terms of this policy when it manifested itself by distinctive symptoms sufficient to interfere with his regular employment or from which a reasonably accurate medical diagnosis could be made. Applying this rule to the facts we conclude that plaintiff's disability was covered under the terms of the policy.[4]

We believe that application of this rule is particularly appropriate in this case. The policy in question was a short-term policy for which no application or physical examination on the insured's part was required. Furthermore, the policy covered not sickness, but sickness which resulted in total

---

[4]The cases relied on by the appellate department of the superior court in reversing the trial court's judgment herein are factually distinguishable from this case. In *Mutual of Omaha Insurance Company* v. *Walley* (1965) 251 Miss. 780 [171 So.2d 358], the plaintiff, prior to the effective date of the policy, suffered a collapsed lung, an X-ray taken showed a spot on his right lung, and sputum taken from him and used for a culture showed active tuberculosis germs. It is true that the culture had not grown to the point where the germs were apparent until after the effective date of the policy, but the germs were present in the sputum taken before that date. It is clear that the disease from which plaintiff suffered was manifest prior to the effective date of the policy in the *Walley* case.

*Lovett* v. *American Family Life Insurance Company* (1963) 107 Ga.App. 603 [131 S.E.2d 70], involved a tubal pregnancy the onset of which is capable of more accurate diagnosis than is the onset of a disease such as atherosclerosis. Medical evidence established that the pregnancy commenced prior to the effective date of the policy and the court distinguished the cases cited in 53 American Law Review 2d 686, 688-689, on the ground that "they all dealt with various diseases, the time of origination of which could not be established by medical evidence." (131 S.E.2d at p. 73.)

*Tasman* v. *Associated Hospital Service of New York,* 19 Misc.2d 809 [198 N.Y.S.2d 49], is similar to *Skroopka* v. *Royal Indemnity Co., supra,* 132 Cal.App.2d Supp. 910. In *Tasman* the plaintiff was operated on for a prostate condition which upon subsequent biopsy appeared to be cancerous. The court stated (198 N.Y.S.2d at p. 51): "The mere fact that the plaintiff had an enlarged prostate at the time would not exclude it from service if it was asymptomatic. However, the evidence here is that this condition was symptomatic for a period of at least two and probably four years. It is not necessary that a diagnosis of cancer should be made at any of the earlier times.

"It is quite apparent that this man had a prostate condition of considerable duration and that he was operated on to cure it. At the time of the operation it was found out that it was cancerous."

and continuous disability. In *World Insurance Company of Omaha, Nebraska* v. *Pipes* (5th Cir. 1958) 255 F.2d 464, the court considered a disability policy which covered "(c) loss of time commencing while the policy is in force and resulting from sickness, the cause of which originates more than fifteen days after the policy date . . . ." In discussing the proper construction of this clause the court stated (255 F.2d at pp. 469-470): "This is a close question. Does the language, 'the cause of which originates more than fifteen days after the policy date,' apply to the word 'sickness,' because it is in closest verbal proximity? Or does it apply to the whole preceding clause, and particularly to 'loss of time'? Pipes could not recover for a sickness that did not cause loss of time. The policy was primarily a 'disability' policy intended to insure against loss of time, rather than merely insuring against sickness as such. 'Cause' has many meanings. It can be anything from some remote medical cause to the direct or immediate disabling cause that brings about the 'sickness' and 'loss of time.' Does the word 'originate,' as used here, mean that the sickness originates when the first germ entered Pipes' body or when enough germs attacked his kidneys to disable Pipes? Must 'sickness' be synonymous with 'disease' in a medical sense? In its ordinary meaning, a person is not 'sick' if he performs his usual occupation and engages in his usual activities. [¶] . . . we agree with the trial judge that 'sickness' under this policy means a disabling sickness causing loss of time from the insured's regular occupation and activities. This is in keeping with the purpose of the policy—to insure against disability." (See *Cohen* v. *North American Life & Casualty Co.* (1921) 150 Minn. 507 [185 N.W. 939].)

As was said in *Fuller* v. *Aetna Life Insurance Company* (5th Cir. 1958) 259 F.2d 402, at page 405: "The construction contended for by appellee would make an applicant for insurance a guarantor that the seeds of manifold pathologic conditions causing disablement — e.g., tuberculosis and other respiratory maladies, nephritis, arteriosclerosis, cancer, ulceration, diabetes—which may or may not reach an acute state, were not present in appellant's body on the policy date and during the fourteen day waiting period. [¶] Read as a whole, it is plain that the parties here were dealing with palpably disabling sickness alone. We have before us a short term policy . . . . Its benefits accrue only in event of total disability."

The judgment of the municipal court is affirmed.