[No. H012493. Sixth Dist. Aug. 10, 1995.]

PAUL VINCENT LUNARDI et al., Plaintiffs and Appellants, v.
GREAT-WEST LIFE ASSURANCE COMPANY, Defendant and
Respondent.

**COUNSEL**

Robb & Ross and Alan J. Titus for Plaintiffs and Appellants.

Howard, Rice, Nemerovski, Canady, Robertson, Falk & Rabkin and Donald F. Miles for Defendant and Respondent.

## OPINION

ELIA, J.—Paul Vincent Lunardi and Denise Lunardi, executor of the estate of Ralph Lunardi, brought this action for breach of contract and negligence after respondent Great-West Life Assurance Company (Great-West) rescinded the insurance policy it had issued on Ralph's life. The trial court ruled that Great-West validly rescinded the policy because Ralph and Paul had concealed and misrepresented Ralph's medical condition during the application period. Accordingly, the court denied plaintiffs' motion for summary adjudication of their breach of contract claim and granted summary judgment to Great-West.

On appeal, plaintiffs maintain that Great-West was not entitled to summary judgment because (1) the "good health" provision on which it relied was unenforceable, (2) Great-West cannot establish misrepresentation or concealment, and (3) Great-West failed to negate their claim that Ralph would have been insurable but for the negligence of Great-West and its agents. We will affirm.

### Background

In May of 1989, Ralph and Paul Lunardi, ages 30 and 28 respectively, were employees and part owners of the family business, Lunardi's Supermarkets. In June or July of that year, Ralph and Paul met with Craig Lodato, an agent with Dempsey Insurance Service, regarding the possibility of purchasing $3 million policies on each other's lives. Lodato asked questions of each brother orally, writing down the answers on an application form. He then asked them to sign blank application forms, indicating that he would transfer their answers to the signed documents later.

The application form contained the following language, placed directly above the signature portion: "THE FOLLOWING STATEMENT MUST BE READ AND SIGNED FOR ALL APPLICATIONS. [¶] All statements and answers to questions made in this application and any supplement to it are true and complete to the best of my knowledge and belief. They are a consideration for and a basis of any contract of insurance issued on this application. No information or answer to any question will be deemed communicated to or be binding on the Company unless set out in this application. No agent is authorized to change or waive the terms of this application or of any contract of insurance issued. Except as stated in the Temporary Life Insurance Agreement and/or in the Conditional Disability Income Insurance Agreement, *no insurance under this application shall take effect unless a policy has been delivered while there has been no material change, to the best of my*

*knowledge, in the answers and statements continued in this application and in any supplement to it.*" (Italics added.)

Paul could not recall whether Lodato explained the significance of this paragraph to him and Ralph. He assumed that the application would be used to begin finding an insurer for the Lunardis.

As part of the application process, Ralph and Paul each submitted to a physical examination by Dr. Virginia Julian, an independent contractor retained by MediTest. On August 9, 1989, Dr. Julian examined Ralph and obtained his medical history, recording his answers on a form F286, which he signed. She then drew blood from Ralph into a "red top" tube, to be subjected to serum testing. Unlike other insurers, Great-West did not request a complete blood count (CBC) from its applicants; hence, Dr. Julian did not collect blood into a "purple top" tube.[1] Dr. Julian's examination showed Ralph to be "completely normal," an "excellent risk" for insurance.

On August 30, 1989, Ralph saw Dr. David Sugarman with complaints of lethargy, headache, neck soreness, weakness, and bruising. On August 31, Dr. Sugarman made a diagnosis of acute myelogenous leukemia. Both Ralph and Paul learned of the diagnosis that day. On September 1, Dr. Sugarman sent Ralph to Stanford University Hospital for treatment. He remained there until October 11, 1989.

On September 1, 1989, the day Ralph entered the hospital, Paul sent a letter by fax to Alan Titus, the Lunardis' attorney, indicating that Lodato needed certain information to complete the insurance application process. Paul added, "We would really like to accelerate the process of obtaining this insurance, so if you do not have hard numbers for him, please extrapolate the best you can."

On September 5, Paul informed Titus of Ralph's condition and asked whether he had a duty to disclose it to the prospective insurer. Titus told Paul that he did not know whether Paul was obligated to volunteer this information, but he must tell the truth if asked. Paul decided not to disclose it unless asked, and he requested that Titus not tell anyone about it. Paul also told family members and supermarket employees not to volunteer any information about Ralph's condition.

---

[1]Dr. Julian testified that in about 99 percent of the examinations she performed for insurers she was asked to submit both "red top" and "purple top" tubes for testing. A representative of Great-West, however, stated by declaration that it was not a normal practice of the industry to require a CBC from insurance applicants. Great-West normally did not ask for a CBC, partly because it was inconvenient for applicants and partly because the information derived from the test did not justify the expense of routinely ordering it.

On September 25, 1989, Paul met with Lodato and Bruce McGuirk, a Great-West representative, to learn about the different insurance options available. Walter Lim, a supermarket employee, was also present. Ralph was in the hospital. No one asked about Ralph's absence, and neither Paul nor Walter Lim mentioned the diagnosis.

A second meeting for the same purpose took place on October 5, 1989. This time Titus attended. Prior to the meeting Paul asked Titus how he should answer if McGuirk or Lodato "were to bring up Ralph." Titus again told Paul to answer truthfully. No one mentioned Ralph's condition at the meeting. At the conclusion of the presentation on the various insurance options, Titus recommended a universal life policy for each brother.

The processing of the Lunardis' application required their medical records, which Great-West requested from their family physician, Dr. Hartwig Sonnenberg, on October 5, 1989. Dr. Sonnenberg sent the records he had the next day. The parties disputed whether those records included a report by Dr. Sugarman of his examination and diagnosis of Ralph; plaintiffs insisted it had been sent, whereas Great-West maintained that it did not receive the report.[2]

On November 17, 1989, Paul received the policies from Lodato along with copies of the original applications and two new forms. Because the physical examinations had taken place more than 60 days earlier, Great-West required an update of each applicant's medical status. The first form, the F286 California, was a medical history questionnaire similar to one used by Dr. Julian during her examination of Ralph;[3] it asked, for example, whether the applicant had any "disorder of the blood," whether he was currently "under observation or taking treatment," and whether he had had any illness or hospitalization in the past five years. The second form, the F59, was provided to "amend the application and to . . . require statements that the insured is still in the same state of health he was [in] when the application was originally taken." Both forms were attached to each policy when the policies were delivered.

---

[2] Dr. Sugarman's office manager believed that she would have followed standard office procedure and sent the report "within a day or so" of September 1, 1989. Dr. Sonnenberg was certain that if the report had been in Ralph's file on October 6, he would have forwarded it to Great-West along with the rest of Ralph's records. Great-West's underwriter, however, submitted a declaration that the records received from Dr. Sonnenberg did not include the Sugarman report.

[3] Dr. Julian had used a F286 United States form; the F286 California contained slightly different wording. Accordingly, Great-West transcribed the information from the form Dr. Julian had used onto the proper California document.

The F59 amendment contained the following language: "I/We declare that since completion of the medical evidence form dated 13 NOVEMBER 1989 [¶] (1) The Insured has not been examined or treated by a physician or health practitioner, except as required by the [sic] Great-West Life. [¶] (2) The Insured has had no illness, disease, injury or operation. . . ." Great-West conceded that it had used the wrong date in this declaration on Ralph's form; instead of asking for information about changes of health since November 13, it should have referred back to the medical examination date of August 9, 1989. Paul, however, did not notice the different date on Ralph's form when he gave it to Ralph to sign.

The F59 also provided the following terms conditioning the effectiveness of the policy on the applicant's responses to the form: "I/We agree that these statements are a condition of the delivery of the policy applied for and become part of the contract. The policy shall not take effect unless these statements are true." This statement immediately preceded the signature line. Below the signature line was the following provision: "NOTICE TO THE INSURED, APPLICANT AND AGENT: [¶] THIS POLICY MUST NOT BE DELIVERED EITHER DIRECTLY OR BY MAIL NOR CAN THE APPLICANT GAIN POSSESSION OF IT UNTIL THIS FORM IS COMPLETED AND WITNESSED. THE FORM SHOULD THEN BE RETURNED TO THE BRANCH OFFICE. [¶] THE POLICY HAS BEEN ISSUED ASSUMING THIS FORM CORRECTLY REPRESENTS THE FACTS. IF THE APPLICANT OR INSURED HAS INDICATED ANY EXCEPTIONS TO STATEMENTS (1) OR (2), IT SHOULD BE CORRECTED AND RETURNED WITH THE POLICY TO THE BRANCH OFFICE. THE POLICY SHOULD NOT BE DELIVERED."

Enclosed with these documents was a cover letter from Lodato instructing Paul to read and send back the signed documents along with checks for the premiums for each brother. Lodato advised Paul that they would be covered as soon as Lodato received the checks. Paul sent the checks with the signed forms on November 20, 1989, and Lodato received them the next day.

Ralph died of leukemia on February 2, 1991. Paul submitted a claim for the proceeds on March 2, 1991. After a routine investigation, Great-West denied the claim, citing Ralph's misrepresentations about his health during the application process.[4] Great-West informed Paul that it was rescinding the policy and tendered a refund of all premiums paid.

---

[4] In its letter denying Paul's claim, Great-West referred to an interview of Ralph by Equifax Services on September 8, 1989. According to the Equifax report of that interview, Ralph was questioned by telephone "due to his busy schedule." Under the heading "HEALTH," the interviewer noted the following: "Applicant states he is in excellent health and has had no major operations, illnesses, or injuries reported for the past 10 years. He is not being treated

On February 24, 1992, plaintiffs filed a four-count complaint against Great-West, Bruce McGuirk, Lodato, and Dempsey Insurance Service.[5] Plaintiffs alleged that Ralph had "fully and accurately" disclosed the state of his health both at the time he applied for insurance and when he was examined by Dr. Julian. Since Dr. Julian had found Ralph to be in excellent health, Great-West approved him for life insurance and delivered a policy to Paul on Ralph's life. Great-West's subsequent failure to pay benefits upon Ralph's death, plaintiffs alleged, was a breach of contract and a breach of the covenant of good faith and fair dealing. Plaintiffs further alleged that defendants were negligent in failing to advise Ralph and Paul that if Ralph's physical condition materially changed between the examination and the issuance of the policy, Great-West could seek to rescind the policy after Ralph's death. Defendants were also negligent because they allowed Ralph and Paul to sign a blank application form, and because they unreasonably delayed the processing of Ralph's application. Finally, the complaint alleged negligent misrepresentation based on defendants' concealment of their intent to rescind the policy in the event that Ralph suffered a material change in health between his medical examination and the issuance of the policy.

Great-West answered, asserting numerous affirmative defenses. It also filed a cross-complaint for declaratory relief, seeking a ruling that it validly rescinded the policy when it discovered that Ralph had failed to disclose a material change in his health during the application process.[6]

On September 2, 1993, plaintiffs moved for summary adjudication and Great-West moved for summary judgment. Great-West argued, inter alia, that Ralph and Paul's concealment of Ralph's condition precluded recovery under the policy. Great-West further disputed the viability of the negligence causes of action, arguing that it had no duty "to disclose potential bases of recission, to counsel applicants about contractual duties defined by the policy, to keep applicants from signing blank application forms if they were willing to do so, nor [sic] to process applications within a particular time period."

Plaintiffs sought summary adjudication of the breach of contract cause of action, reasoning that Great-West had waived any right to challenge the

by a doctor for any reason at this time." Plaintiffs, however, dispute that this interview actually took place. The parties agree that Ralph was in the hospital at the time of the interview.

[5]McGuirk, Lodato, and Dempsey Insurance Service were eventually dismissed as defendants.

[6]Great-West had previously filed an action in federal court. That matter was dismissed without prejudice.

effectiveness of the policy. According to plaintiffs, there was no material change in Ralph's condition after the medical examination; he had leukemia when he was examined by Dr. Julian, and he had "that same leukemia" when he received his policy. Great-West could have discovered Ralph's condition, plaintiffs argued, if it had been willing to pay for a CBC, a simple test required by most life insurers. In addition, Ralph's medical records, containing a diagnosis of acute myelogenous leukemia, were sent to Great-West five weeks before the policy was issued. Thus, Great-West's unawareness of Ralph's condition was its own fault, since it had access to the necessary facts. The law did not require Ralph to volunteer information the insurer could easily have found had it investigated more carefully.

After a hearing on these motions, the trial court ruled that plaintiffs were not entitled to recover for breach of contract. Because the policy was ineffective unless Ralph continued to be in good health, and because Ralph and Paul concealed Ralph's illness before issuance of the policy, Great-West validly rescinded the contract. Great-West did not waive its right to challenge the effectiveness of the policy, because it had no knowledge of Ralph's condition or of facts giving rise to a duty to inquire further.[7]

*Discussion*

1. *Scope of Review*

In this case, we confront competing motions for summary adjudication and summary judgment. ■ A summary adjudication motion is subject to the same rules and procedures as a summary judgment motion. Both are reviewed de novo. (*Heredia* v. *Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1353 [279 Cal.Rptr. 511]; *Westlye* v. *Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1727 [22 Cal.Rptr.2d 781].) The moving party must point to undisputed facts that compel adjudication or judgment in its favor. If the moving party is successful, the opposing party must then raise triable issues as to the other's assertions of undisputed fact. In considering this appeal, we take into account each party's dual obligation in justifying summary judgment or adjudication while resisting the other party's motion.

2. *Effectiveness of the Good Health Provision*

■ Plaintiffs take exception to the following language printed just above the signature line on the application form: ". . . [N]o insurance under

---

[7]The trial court also found that Denise Lunardi, executor of Ralph's estate, had no standing in the case because Ralph was not a party to the policy. Although this ruling is contested on appeal, we will not address the issue.

this application shall take effect unless a policy has been delivered while there has been no material change, to the best of my knowledge, in the answers and statements continued in this application and in any supplement to it."

Plaintiffs argue this condition was ambiguous in three respects. First, it uses the word "continued" instead of "contained," rendering the provision meaningless. Second, the "no change" term "does not require that the answers remain 'correct' or that the health of the insured remain unchanged, only that the answers remain unchanged, which they did." Third, it is not clear whether the condition requires that there be no change in the applicant's health or no change in his *knowledge* of his health "as it existed on the application date." (Italics omitted.)

■ The rule of construction favoring the insured is intended to protect the insured's *reasonable* expectation of coverage. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].) The rule does not apply if the language is clear and explicit. (*Ibid.*; *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

■ Here, the continued good health term is not ambiguous. Whether or not the drafters intended to use the word "contained" rather than "continued," the provision nevertheless informs the applicant that the answers to the questions in the application must still be true when the policy is delivered. Plaintiffs' remaining assertions of ambiguity are at best hypertechnical dissections of the language. We will not engage in strained or tortured interpretation of the terms of an insurance contract in order to fabricate an ambiguity where none existed. (*Titan Corp.* v. *Aetna Casualty & Surety Co.* (1994) 22 Cal.App.4th 457, 469 [27 Cal.Rptr.2d 476].)

■ Plaintiffs protest that even if the language of the disputed paragraph is clear, Ralph and Paul were justifiably unaware of it because Lodato insisted they sign the blank form without pointing out the paragraph or giving them a copy of the application until the policy was delivered. As Great-West points out, however, Ralph was bound by conspicuous provisions of the document he signed. (*Sarchett* v. *Blue Shield of California* (1987) 43 Cal.3d 1, 15 [233 Cal.Rptr. 76, 729 P.2d 267].) Even if he did not receive a copy until delivery of the policy, he was obligated at that time to correct any misstatements or omissions in the representations regarding his health. (*Telford* v. *New York Life Ins. Co.* (1937) 9 Cal.2d 103, 107 [69 P.2d 835]; *Layton* v. *New York Life Ins. Co.* (1921) 55 Cal.App. 202, 206 [202 P. 958].)

■ Plaintiffs attempt to avoid the effect of the good health provision by arguing that it was inapplicable to a condition that could have been detected in the medical examination. This contention cannot succeed. First, it is based on an unwarranted assumption that Ralph's leukemia was detectable. This was a disputed factual issue, however. Dr. Lee Levitt, Ralph's treating physician, believed that a CBC would have revealed indications of leukemia, whereas Dr. William Alexander, Great-West's medical director, stated that it could not be determined with medical certainty that Ralph would have tested positive for leukemia if he had been tested on August 9, 1989.[8]

Second, plaintiffs' contention is legally unsupportable. In *Metropolitan Life Ins. Co.* v. *Devore* (1967) 66 Cal.2d 129 [56 Cal.Rptr. 881, 424 P.2d 321, 30 A.L.R.3d 376], the Supreme Court considered the effect of a "good health" provision where the applicant unknowingly had arteriosclerosis when he applied for life insurance. There, as in this case, the condition was not revealed during the prerequisite medical examination, but the insured's private physician made the diagnosis before delivery of the policy. The beneficiary unsuccessfully claimed that no change in health occurred because the insured's disease existed before the application. The controlling question, the Supreme Court explained, was not when the condition arose, but when it became manifest. Because the arteriosclerosis became manifest after application but before the policy was delivered, a material change in health could be said to have occurred. Whether the condition was detectable was not a part of the court's inquiry.

Plaintiffs attempt both to discount and to follow *Devore*. First they cite inapplicable precedent from other states in arguing that *Devore* is of questionable authority because it allows insurers to avoid the consequences of failing to examine applicants for detectable conditions. Plaintiffs next suggest that Ralph's leukemia was "manifest" on August 9, 1989, the day Dr. Julian examined Ralph. By failing to conduct a confirmatory CBC, they argue, Great-West assumed the risk that Ralph had the disease. Because Great-West then "accepted Ralph's health with the leukemia . . . the subsequent progression of the disease and its diagnosis is not considered a 'material change' under the law."

These arguments must be rejected. *Ortega* v. *North American Co. for Life & Health Ins.* (1971) 187 Neb. 569 [193 N.W.2d 254] and *Wanshura* v. *State Farm Life Ins. Co.* (Minn. 1978) 275 N.W.2d 559, on which plaintiffs rely

[8]In her deposition, Dr. Julian initially hesitated to offer an opinion on this subject; but she then expressed the belief that an abnormality probably would have been found had a CBC been performed on August 9.

for their theory of detectability, do not represent the law of this state. Furthermore, their facts are distinguishable. In *Ortega*, the insured had no opportunity to advise the insurer of his cancer because he did not receive a diagnosis until after he had paid the premium and the policy was delivered. Likewise, in *Wanshura*, the applicant was diagnosed with cancer after the policy became effective. In neither case did the applicant affirmatively misrepresent facts on which the insurer relied in issuing the policy.

Ralph and Paul's misrepresentation distinguishes their circumstances even from *Devore*. In both *Devore* and its companion case, *Harte* v. *United Benefit Life Ins. Co.* (1967) 66 Cal.2d 148 [56 Cal.Rptr. 889, 424 P.2d 329], the insured had no knowledge of his illness before delivery of the policy and believed in good faith that his medical status was acceptable to the insurer. (See also *Brubaker* v. *Beneficial etc. Life Ins. Co.* (1955) 130 Cal.App.2d 340 [278 P.2d 966] [absent fraud or deceit in insured's representations of good health, subsequent proof that the representations were unfounded do not void policy]; *Miller* v. *Republic Nat. Life Ins. Co.* (9th Cir. 1986) 789 F.2d 1336 [under California law, applicant must disclose health changes that he believed in good faith were material].) Here, by contrast, Ralph and Paul knew that Ralph was afflicted with leukemia before the policy was issued. The application informed them that their answers to the health questions must remain correct until delivery of the policy for it to be effective. The F59 specifically conditioned delivery upon Ralph's continued good health. Ralph's knowledge of his condition makes his statement, "there has been no material change, to the best of my knowledge," untrue. Thus, even assuming Ralph's condition was detectable on the day of his required medical examination, the failure of the condition specified in the good health provision rendered the policy ineffective.[9]

*Bower* v. *Roy-Al Corp.* (1973) 33 Cal.App.3d 1027 [109 Cal.Rptr. 612] does not assist plaintiffs. There no application or medical examination was required, and the policy covered sickness resulting in total and continuous disability. Although the plaintiff had experienced symptoms of atherosclerosis before the policy inception date, they did not interfere with his employment, and the disease did not become manifest or acute until after the policy

---

[9]Plaintiffs' contention that an issue of fact exists as to whether Ralph's disease was manifest on August 9 is untenable. The evidence they offer is that Ralph had been experiencing lethargy for a month prior to Dr. Sugarman's examination, and bruising for an undetermined period. There is no evidence, however, that bruises were apparent on August 9, the date of Dr. Julian's examination. Furthermore, if Ralph indeed had symptoms of "being tired" and "very lethargic" with "no energy," as he reported to Dr. Sugarman, he should have disclosed that fact in his application, instead of representing that he had not felt "excessive fatigue" in the past 10 years. An insured who withholds information and then blames the insurer for not discovering it is at best exhibiting gamesmanship; he cannot have it both ways.

became effective. *Bower* does not direct or even imply that where a physical examination is given, a disease is manifest at that time if it is detectable by routine testing. Such a holding would place an impermissible burden on insurers to order every conceivable precautionary test that might later be called "routine," even though indications of latent disease are absent. We therefore cannot agree with plaintiffs' proposition that a material change in health is deemed not to have occurred merely because a laboratory procedure might have detected an abnormality in the insured's condition at the time of the prerequisite examination. We certainly will not accept such a rule where an applicant for insurance has withheld or misrepresented his symptoms during the physical examination.[10]

### 3. *Estoppel*

■ Plaintiffs next argue that Great-West is estopped from enforcing the good health provision because Craig Lodato, acting as Great-West's agent, held Ralph's application from the end of June until August 16, thereby violating the covenant of good faith and fair dealing. There is no merit in this argument. First, even assuming Lodato had the application at the end of June rather than July,[11] the doctrine of estoppel is inapplicable, since there is no evidence that the Lunardis detrimentally relied on any assurances that their applications would be reviewed and approved immediately. Paul understood that the applications merely initiated the process of selecting an insurer and a policy. Ralph did not have his medical examination until August 9. Paul did not appear anxious to expedite the process until September 1, after learning of Ralph's diagnosis. Great-West could not have completed its review until Paul and Ralph decided what kind of policy they wanted, and they did not make that decision until October 5 after meeting with McGuirk and Titus. Furthermore, no authority supports the allegation that Great-West should have advised Ralph of the risks of delay.[12] Because no genuine issue of fact exists as to Great-West's responsibility for the delay in Ralph's securing life insurance, plaintiffs' contention must be rejected.

---

[10]Although Ralph stated he had not experienced "excessive fatigue" on the application, he had been feeling "very lethargic" with "no energy" for the month before he saw Dr. Sugarman on August 30, 1989. There is no evidence or even a suggestion that Ralph disclosed these symptoms to Dr. Julian during her examination of him.

[11]The parties presented conflicting evidence as to whether the parties signed the application forms in late June or late July. Lodato's notes indicated that he took the applications on July 28, whereas Paul recalled this occurring at the end of June. Plaintiffs point out that Paul's account must be correct because he underwent his medical examination on July 5. For purposes of the summary judgment proceedings, Great-West has accepted that this meeting took place in late June.

[12]*Barrera* v. *State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659 [79 Cal.Rptr. 106, 456 P.2d 674], and *Ranes* v. *Paul Revere Life Ins. Co.* (9th Cir. 1994) 32 F.3d 1393 are factually distinct from this case. In *Barrera* the insurer failed to investigate the applicant's auto insurability until a claim was filed, almost two years after receiving the application. In

### 4. *Waiver*

An insurer may waive its right to material information either "(a) by the terms of insurance or (b) by neglect to make inquiries as to such facts . . . ." (Ins. Code, § 336.) ▮ Plaintiffs argue that Great-West waived the condition of good health by failing to inquire as to Ralph's health before delivering the policy. Plaintiffs rely on *Seidler* v. *Georgetown Life Ins. Co.* (1980) 82 Ill.App.3d 361 [37 Ill.Dec. 664, 402 N.E.2d 666] and *Bi-Link Metal* v. *Louisiana & Southern Life Ins.* (1981) Ill.App.3d 239 [51 Ill.Dec. 717, 421 N.E.2d 225], in suggesting that unless such inquiry is made, delivery is conclusive against the insurer.

Plaintiffs' reliance on *Seidler* and *Bi-Link* is misplaced. In each case the insured made no misrepresentations in his application for insurance. The insurer was aware of the applicant's higher risk for heart problems and adjusted the policy premium accordingly. Before delivery of the policy, the applicant did not tell the insurer that he had been hospitalized since his application, and the insurer did not inquire as to any health changes. In *Seidler*, a question of fact arose as to whether the insured died of his preexisting disease or a newly contracted condition. In *Bi-Link*, the insured died of causes unrelated to the heart problems for which he was hospitalized.

Neither the facts nor the holdings of these decisions permit a conclusion that the good health provision was unenforceable in the instant case, primarily because Great-West did inquire as to Ralph's health at the time of delivery. Attached to the policy was a copy of Ralph's application and the new forms which required his signature before the policy could be effective. These documents made it clear that the insurance could not take effect if Ralph's medical condition was different from that indicated at the time he submitted his application.

▮ Waiver is the intentional relinquishment of a *known* right. (*Alta Cal. Regional Center* v. *Fremont Indemnity Co.* (1994) 25 Cal.App.4th 455 [30 Cal.Rptr.2d 841]; *Anaheim Bldrs. Supply, Inc.* v. *Lincoln Nat. Life Ins. Co.* (1965) 233 Cal.App.2d 400, 410 [43 Cal.Rptr. 494].) An insurer does not waive its right to rescind a policy on the ground of false representations if it was unaware of the falsity of those representations. (*Cal.-West. States etc. Co.* v. *Feinsten* (1940) 15 Cal.2d 413, 422 [101 P.2d 696, 131 A.L.R. 608]; *Anaheim Bldrs. Supply, Inc.* v. *Lincoln Nat. Life Ins. Co., supra*, 233 Cal.App.2d at pp. 410-411.)

---

*Ranes*, the insurer took nearly three months to process the application for disability insurance, even though it promised to do so within sixty days or notify the applicant of any reason for delay. Neither case supports the assertion that Great-West was responsible for Ralph's delay in completing the application process.

■ Plaintiffs argue that a factual issue exists as to whether Great-West issued the policy with knowledge of Ralph's leukemia. If Great-West in fact received Dr. Sugarman's report containing the diagnosis, they reason, it was presumed to have known that Ralph had leukemia and nonetheless decided to issue the policy.

This position rests on assumptions unsupported by the facts. It is indeed disputed that Dr. Sugarman's office sent the records to Dr. Sonnenberg, and that Dr. Sonnenberg sent the Sugarman report to Great-West. It is not disputed, however, that Great-West did not have the Sugarman report when it reviewed and approved Ralph's application. Without Dr. Sugarman's report, Great-West was not on notice that it should inquire further into Ralph's medical status. It reasonably relied on the medical records it did have, the results of Dr. Julian's examination, and Ralph's answers to direct questions regarding the current state of his health.[13] Thus, there is neither factual nor legal basis on which to conclude that Great-West waived the requirement of Ralph's continuing good health.

## 5. *Great-West's Right to Rescind*

■ ■ In both its motion for summary judgment and its opposition to plaintiffs' motion, Great-West argued that it had properly rescinded the policy because Ralph and Paul concealed and misrepresented Ralph's medical condition, in violation of Insurance Code sections 331 and 359.[14] The trial court correctly ruled in Great-West's favor on this ground.

■ Section 331 provides: "Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance." Concealment is defined in section 330 as "[n]eglect to communicate that which a party knows, and ought to communicate." In addition, section 332 states: "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."

Plaintiffs argue that Ralph had no duty of disclosure under these statutes because Great-West had the means of discovering his disease. By choosing

---

[13]*Williams* v. *Seaboard Life Ins. Co.* (1969) 274 Cal.App.2d 95 [78. Cal.Rptr. 597] and *DiPasqua* v. *California Etc. Life Ins. Co.* (1951) 106 Cal.App.2d 281 [235 P.2d 64] are distinguishable. In *Williams* there was substantial evidence to support the trial court's finding that the insurer had received a report of the plaintiff's complete medical history and that the plaintiff had not deceived or misled the insurer. In *DiPasqua*, the insurer possessed a written report indicating that the insured had provided false answers to medical examiners in the course of applying for life insurance. Under those circumstances the insurer should have inquired further into the insured's medical history instead of relying on the false answers.

[14]Further statutory references are to the Insurance Code.

not to obtain a CBC during the application process, Great-West "accept[ed] the risks of blood disease," and may not now complain.

Plaintiffs' position cannot succeed. Section 332 does not require the insurer to take all possible measures to reveal undisclosed conditions. Furthermore, the insured's obligation to report misstatements in the application is based on the duty of good faith and fair dealing imposed on both parties. (*Telford* v. *New York Life Ins. Co.*, *supra*, 9 Cal.2d at p. 107; *Rutherford* v. *Prudential Ins. Co.* (1965) 234 Cal.App.2d 719, 726-727 [44 Cal.Rptr. 697].) Ralph's failure to disclose his diagnosis and thereby correct the misstatements in his application clearly constitutes a breach of this continuing duty and provides a basis for recission under section 332.

Plaintiffs further argue that no disclosure was required because Great-West failed to inquire about changes in Ralph's health between the medical examination and issuance of the policy. Section 333 permits a party to avoid communicating certain facts except in responding to the other party's inquiry.[15] Great-West, however, did make this inquiry. The F59 enclosed with the policy asked whether Ralph had been "examined or treated by a physician or health practitioner" and whether he had had any "illness, disease, injury or operation" since completion of the medical evidence form. That Great-West erroneously represented the completion of the medical evidence form as occurring on November 13, 1989, instead of August 9, 1989, is insufficient to relieve Ralph of his duty to disclose his illness.[16] Furthermore, the F286 contained the same questions that Ralph had answered at the time of his medical examination. In signing the F286 Ralph withheld material new

---

[15]This section provides: "Neither party to a contract of insurance is bound to communicate information of the matters following, except in answer to the inquiries of the other: [¶] 1. Those which the other knows. [¶] 2. Those which, in the exercise of ordinary care, the other ought to know, and of which the party has no reason to suppose him ignorant. [¶] 3. Those of which the other waives communication. [¶] 4. Those which prove or tend to prove the existence of a risk excluded by a warranty, and which are not otherwise material. [¶] 5. Those which relate to a risk excepted from insurance, and which are not otherwise material."

[16]Ralph did not read the forms or the cover letter, but merely signed as instructed by Paul. Paul testified that he did not believe disclosure of the leukemia was necessary because the application process was complete at the time of the physical examination and because there had been no changes in Ralph's condition since November 13. Plaintiffs offer the suppositious argument that it would be unfair to impose "an enlarged duty" to disclose facts arising since August 9 because "[t]he insured, with little knowledge of the life insurance business would assume that the company had reasons for the limited inquiry. *Without any intent to defraud*, he would have answered the question asked, and reasonably believed that a valid policy had been issued." (Italics added)

This hypothetical scenario has no relevance to the instant case. Paul and Ralph intentionally withheld material information from Great-West that they knew would affect Ralph's insurability. Paul relied on Great-West's mistake in dates while knowing that the information the insurer sought was material. We will not entertain plaintiffs' oblique suggestion that Ralph

information that made the answers he originally gave untrue. Finally, as discussed earlier, the application itself conditioned the effectiveness of the policy on the continued good health of the applicant. Under these circumstances, Ralph's concealment of his diagnosis entitled Great-West to rescind the policy.

For the same reasons, summary judgment was proper on the ground of misrepresentation. Section 359 provides: "If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false."

"It is generally held that an insurer has a right to know all that the applicant for insurance knows regarding the state of his health and medical history." (*Thompson* v. *Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 915 [109 Cal.Rptr. 473, 513 P.2d 353].) In this case, the right was a continuing one; Great-West emphasized in the application that the policy would not be effective unless, when it was delivered, there had been "no material change" in the answers and statements provided in the application "and in any supplement to it."

The F286 contained Ralph's acknowledgment that he had read the document and that to the best of his knowledge and belief, his answers to the questions were true. On the F59 Ralph represented that he had not experienced any change in health since the completion of the earlier medical history forms. Notwithstanding the mistake in date on the F59, Ralph thus falsely represented that his health remained unchanged and that his previous answers to the medical questions were still correct.

Plaintiffs contend that section 359 is inapplicable because Great-West did not rely on Ralph's answers to the F59 and F286 in issuing the policy. This argument is based on a misleading interpretation of Lodato's letter to Ralph and Paul, in which he requested their signatures on these forms along with their payment of the premium. The letter from Lodato directed Paul as follows: "Paul—I have enclosed two policies for you. [¶] Please send back to me: (after reading) [¶] 1. *Four* pages each with required signature highlighted in yellow. (I will witness and date) [¶] 2. *Two* checks (to Great West Life) . . . [¶] You are covered as soon as I receive the checks. Each day covered before Dec 1, 1989 is free coverage."

Plaintiffs read the language, "You are covered as soon as I receive the checks" to imply that the effectiveness of the policy was contingent only

---

and Paul, having no intent to defraud, innocently believed that the insurer would be unconcerned with any but the most recent four days of health.

upon payment of the premium, not upon signing the attached forms. This interpretation distorts the facts. Lodato's letter clearly informed Ralph and Paul that they must sign the F286 and F59 forms. In assuring them that they would be covered when he received their checks, Lodato obviously assumed that they would enclose the signed forms along with the premium payment. Paul admitted that he understood that these signatures were required.

Plaintiffs suggest several other routes by which to escape the statutory duty to disclose Ralph's change in medical condition. All are meritless. First, they argue, the policy was effective upon delivery of the policy, "subject at most to return of the forms without regard to their content." Next, they claim, the policy was delivered without including a *signed* F59 and F286; attached were only the *unsigned* forms, which did not contain any misrepresentations. Finally, they argue, the F59 was ambiguous. It could have been construed to inquire about illnesses since November 13, 1989, the day Great-West issued the policy; the language could have been confusing; and it implied an inquiry only into active diseases, not into conditions in remission. Even if the F59 included preexisting conditions, plaintiffs add, there is "no evidence that Ralph knew he had the disease on November 16, when he signed the F59."

None of these arguments has any foundation in either the law or the record. There is no question that Ralph's disease, whether in remission or not, was a material matter which should have been disclosed and which would have influenced Great-West's decision to insure Ralph. ▮ Materiality depends on the " 'probable and reasonable effect that truthful disclosure would have had upon the insurer in determining the advantages of the proposed contract. [Citations.] Essentially, we must decide whether the insurer was misled into accepting the risk or fixing the premium of insurance. [Citations.]' " (*Old Line Life Ins. Co.* v. *Superior Court* (1991) 229 Cal.App.3d 1600, 1605 [281 Cal.Rptr. 15], quoting *Holz Rubber Co., Inc.* v. *American Star Ins. Co.* (1975) 14 Cal.3d 45, 61 [120 Cal.Rptr. 415, 533 P.2d 1055, 79 A.L.R.3d 518]; § 334.) ▮ It was undisputed that Great-West would not have insured Ralph had it known of his disease.

▮ We conclude, therefore, that Great-West met its burden of presenting undisputed facts establishing misrepresentation and concealment within the meaning of sections 330 et seq. and 359. Plaintiffs failed to present triable issues of fact on these issues, and their interpretations of both the policy and the applicable statutes are unconvincing. Accordingly, the trial court correctly ruled that Great-West was entitled to rescind the policy.

### 6. *Negligence and Negligent Misrepresentation*

Although Great-West successfully established concealment and misrepresentation, we must nevertheless consider plaintiffs' claim that Great-West's right to rescind arose as a result of its own negligence in processing Ralph's application. If Great-West was negligent, as plaintiffs alleged, Ralph would have been insured before he was diagnosed with leukemia and no occasion for misrepresentation would have arisen.

The trial court ruled that Great-West's motion demonstrated the absence of the elements of negligence. Great-West owed no duty of care to Ralph or Paul; any negligence caused no harm because the delay was attributable to Ralph and Paul; and only 34 days elapsed between the time Lodato became Great-West's agent and the diagnosis of Ralph's condition, an insufficient period to establish negligence as a matter of law.

The only issue of significance in this appeal is whether the delay was attributable to the conduct of Great-West or its agent, Craig Lodato. Plaintiffs maintain that Great-West could have taken certain measures to assure Ralph coverage before November 1989. Great-West should have, for example, advised Ralph and Paul of the good health provision, informed them within a reasonable time of the available types of insurance, offered them the opportunity to pay a premium at the time of application and thereby obtain conditional coverage, used the proper F286 at the outset, and informed them that the application process would be delayed while Dempsey Insurance Service became a registered agent of Great-West.

None of these alleged failings gave rise to actionable negligence under the circumstances presented. Assuming for purposes of discussion that Lodato was an agent of Great-West when he took Ralph's application, nevertheless the delay cannot be imputed either to him or to Great-West. It was undisputed that Great-West could not issue a policy until Ralph and Paul identified their beneficiaries and decided what kind of policy they wanted. In August or September of 1989 the Lunardis were still trying to make this decision. They did not select a universal life policy until October 5, and Great-West did not receive that information until November 8. Great-West learned of the beneficiary designation on October 26, 1989. Great-West also had to wait for Dr. Sonnenberg's medical records and information from the Lunardis related to the family business. The business information was not provided until September 21, 1989, and the medical records were not received until October 12, 1989.

In addition, there is no evidence that the Lunardis were in a hurry to obtain life insurance until they learned of the diagnosis. Paul understood the

meetings with Lodato to be for the purpose of gathering information "in order to begin finding an insurance company for [the] Lunardis." Lodato explained that a physical examination would be required. Although Paul was able to arrange with MediTest to have his examination on July 5, Ralph's did not take place until August 9.

There is no evidence that Lodato or Great-West was responsible for these delays. Nor was there a duty by Great-West to advise them to accelerate their physical examinations and insurance decisions in order to obtain coverage sooner. *Stark* v. *Pioneer Casualty Co.* (1934) 139 Cal.App. 577 [34 P.2d 731], on which plaintiffs rely, is distinguishable. There the agent took the applicant's annual premium, promising that if her application were rejected he would refund her money. The agent then held her application, giving her the impression that she was covered and need not seek insurance elsewhere. After the applicant's subsequent claim was rejected, she success-fully obtained a judgment against the insurer. In affirming, the appellate court noted that since the agent had received both the application and the premium, the applicant relied on its delivery to the insurer, and the insurer assumed the duty of promptly either issuing a policy or rejecting the application. Having received no notice of rejection, the applicant was enti-tled to assume that her application had been accepted.

These facts are entirely different from those before us, where no premium was paid or agreement made to notify Ralph and Paul if their application were declined. Because plaintiffs did not present evidence sufficient to raise a triable issue of fact regarding liability for delay in processing Ralph's application, the trial court correctly ruled that their cause of action for negligence could not be established as a matter of law.

Likewise, Great-West cannot be liable for negligent misrepresentation, as plaintiffs alleged. On appeal, plaintiffs offer two instances of misrepresen-tation. The first occurred during a meeting in May 1989 with Lodato and Tony Sortino, a Dempsey Insurance Service employee, in which the Lunar-dis discussed estate planning and reviewed their various existing insurance policies. When Paul mentioned the possibility of life insurance, Sortino pointed to Lodato and said, " 'Well, Paul, Craig is the expert on that.' " Paul explained to Lodato that he was looking for "some sort of insurance" to protect them from the burden of estate taxes in the event of their parents' death. Lodato asked them how much coverage they were looking for, and then said he would "get working on it."

There were no actionable misrepresentations here. First, Sortino's referral to Lodato was at most a statement that Lodato was more qualified than he to

discuss the subject of life insurance with Paul. Second, even assuming the statement represented Lodato as an expert in the area of life insurance, there is no evidence that Lodato did not have such expertise. Third, as we have already discussed, the delay in obtaining coverage was not attributable to any acts or omissions of Lodato. No authority is offered to support plaintiffs' assertion that Lodato lacked expertise because he held the applications for 45 days and did not point out the good health provision conspicuously printed in the application.

The second misrepresentation plaintiffs point to is a statement "that the applications would be processed expeditiously." No evidence in the record is cited to support this claim, or even a reference to the person who made the alleged statement.[17]

In summary, Great-West adequately met its burden of establishing its right to rescind the policy and the absence of actionable negligence or negligent representation. The trial court correctly ruled that Great-West was entitled to summary judgment. In light of this conclusion, it is unnecessary to reach the issue of whether Denise Lunardi had standing to bring the action on behalf of Ralph's estate.

*Disposition*

The judgment is affirmed.

Cottle, P. J., and Premo, J., concurred.

---

[17]In their reply brief, plaintiffs add a third instance of misrepresentation—Lodato's statement that Ralph and Paul would be covered when he received the checks. According to plaintiffs, "[i]f coverage is denied, rendering this statement false, it will clearly constitute negligent misrepresentation." It makes no difference that plaintiffs did not raise this desperate argument in the opening brief, because it has insufficient merit to require a response from Great-West.