[L. A. No. 27982.   In Bank.   Mar. 10, 1967.]

METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff and Appellant, v. JOSEPHINE DEVORE, Individually and as Administratrix, etc., Defendant and Respondent.

JOSEPHINE DEVORE, Plaintiff and Respondent, v. METROPOLITAN LIFE INSURANCE COMPANY, Defendant and Appellant.

(Consolidated Cases)

130

Adams, Duque & Hazeltine and James S. Cline for Plaintiff and Appellant and for Defendant and Appellant.

Pollock, Pollock & Fay, Eugene P. Fay, Edward I. Pollock and Louis P. Friedman for Defendant and Respondent and for Plaintiff and Respondent.

MOSK, J.—Metropolitan Life Insurance Company (hereinafter Metropolitan) brought an action to cancel or rescind a 15-year mortgage term life insurance policy issued to Charles Devore. The complaint alleged that Metropolitan's liability was conditioned on Devore's "continued insurability" at the time the policy was delivered, that Devore was not in good health at the time of delivery and was aware of this fact, and that he had concealed material matters relating to his health in his application for insurance. Devore died after this action was filed and subsequently his widow and beneficiary of the policy, Josephine Devore, brought suit to recover death benefits.[1] The two actions were consolidated for purposes of trial and the court, sitting without a jury, found against Metropolitan and in favor of Mrs. Devore.

On September 2, 1959, Charles Devore executed Part A of a written application for insurance. The questions in this part did not relate to his medical history. At the end of Part A, the application provided, "The Company shall incur no liability under this application until a policy has been delivered and the full first premium specified in the policy has actually been paid to and accepted by the Company during the lifetime and continued insurability of the applicant, in which case such policy shall be deemed to have taken effect as of the date of issue as recited therein. . . ."

On September 21, 1959, Devore submitted to a medical examination by a doctor of Metropolitan's choice. During the examination, the doctor filled in Parts B and C of the application. Part B, which was signed by Devore, consisted of his answers to a series of questions relating to his medical history, and Part C was the doctor's report on the physical examination given to Devore. In Part B the following questions and answers appear:

"4. Have you ever had or been treated for or sought advice concerning . . . any disease of the blood or blood vessels? [A] No.

"5. (a) Have you ever been a patient in or visited a hospital, clinic, dispensary or sanatorium for observation, examination or treatment? [A] Yes. Appendectomy 5 yrs ago. Good Samaritan hosp. Portland, Ore., Dr. Chauncey.

"(b) Have you ever had or been advised to have a surgical operation? [A] Yes. [Same as answer to (a).]

---

[1] After Devore's death, Mrs. Devore was substituted by stipulation as a defendant in Metropolitan's action.

"(c) Have you ever been advised to modify or restrict your eating, drinking or living habits because of any health condition? [A] No.

"(d) Do you have periodic physical examinations or check-ups? [A] Yes—Dr. Thorner, Beverly Hills.

"(e) Have you ever had an electro-cardiogram or X-ray examination or any laboratory examinations or tests? [A] Yes. 1 yr ago. Routine exam Dr. Thorner ch. X-ray EKG neg.

"(f) Have you consulted any physician, healer or other practitioner within the past 5 years for any reason not mentioned above? [A] No."

Devore's application was sent to Metropolitan's headquarters in San Francisco, and after an investigation Metropolitan discovered that Devore had a history of dyspepsia or indigestion in 1953 and a possible cardiospasm or pylorospasm in 1959 (a spasm of the muscles at the inlet or outlet of the stomach). Metropolitan asked Devore to report to its doctor again and at this interview on October 14, he stated that he had experienced occasional attacks of indigestion, that in 1952 he had been advised by a physician to refrain from eating fatty foods, and that the tests given at that time were negative.

On October 10, 1959, Devore went to Dr. Thorner, his own physician, for a routine physical examination. On that date Dr. Thorner took an electrocardiogram, which was found to be normal, but he requested Devore to return on October 19. Another electrocardiogram, taken on the 19th after exercise, showed an abnormality. The doctor diagnosed Devore's condition as arteriosclerotic heart disease, but did not convey this information to Devore. The evidence with regard to Devore's condition and his knowledge of it will be discussed in more detail hereinafter. Dr. Thorner suggested that Devore be admitted to the hospital "for rest and medication to prevent trouble" and Devore entered the hospital on October 21, 1959, remaining there until he was discharged on October 26. After his discharge, he continued under Dr. Thorner's care until he died of heart disease on January 10, 1962. Witnesses for Metropolitan testified that the company would not have issued a policy if it had known about Dr. Thorner's diagnosis and treatment of Devore's heart condition.

Metropolitan approved the issuance of a policy to Devore on November 12, 1959, and issued a policy on an "intermediate" basis, which required a higher premium than would be applicable for a man of Devore's age who was in average health. The policy was delivered to him on November 30, at

which time he paid a full year's premium. He also executed a document entitled "Application Amendment," which stated in part:

"The undersigned hereby amends the application for Life insurance made to your Company on the date stated above— By changing the classification to Intermediate. By correctly stating the amount of insurance as $20,000. By requesting that the policy issued bear date of issue of September 1, 1959. By answering 'No' to Question 9(b), Part B, reading: 'Have you during the past five years been associated with any person suffering from tuberculosis?' These amendments and declarations are to be considered as a part of the said application and subject to the agreements, covenants, and statements therein contained. The said application, together with these amendments, is to be considered as the basis of and as a part of the contract of insurance. *The said application, as amended, is correct and true, and I hereby ratify and confirm the statements therein made as of the date hereof.*" (Italics added.)

The first question for determination is whether the italicized portion of the application amendment should be construed to mean, as Metropolitan contends, that the answers given by Devore in the original application were true as of November 30, the date the amendment was executed, or whether the language is ambiguous and may reasonably have been understood by Devore to mean he was confirming that the answers in the original application were true when they were made in September. The trial court found in favor of the latter construction. It also found that Devore reasonably understood the language of the amendment to mean that "Metropolitan Life Insurance Company is satisfied with and is relying upon the application of September 2, 1959, and on the basis of said application the Company is issuing a substandard Intermediate policy if the insured . . . authorizes said application to be amended so as to apply for said sub-standard policy at a higher rated premium and to include therein the other specific amendments. . . ."

Metropolitan does not seriously contend that Devore made material misrepresentations in his original application.[2] It

---

[2] The trial court found that Devore's answers in the application were substantially true, honest and complete. The only respect in which Metropolitan challenges this finding is by an assertion that Devore had falsified the application in that he had failed to mention visits to Dr. Berns, a psychiatrist. Dr. Thorner testified at the trial that Devore had told him on November 12, 1959, that he, Devore, was seeing a psychiatrist that day, and Mrs. Devore testified that Devore saw a psychiatrist "very seldom,"

is obvious, however, that if the application speaks as of November 30, Devore's answers to several questions are false.

In urging the ambiguity of the application amendment, Mrs. Devore relies heavily on *Marshall* v. *Metropolitan Life Ins. Co.* (1950) 405 Ill. 90 [90 N.E.2d 194], in which the identical language was held to be ambiguous and to refer not to the date of the execution of the amendment, but to the date of the original application. There, in an application for insurance executed on March 3 and 4, 1944, the insured gave certain answers to questions relating to his medical history, stating, *inter alia*, that he had never experienced any heart disease. On March 10, he suffered a heart attack and, prior to delivery of the policy on March 22, he was informed that he had a serious heart disorder. When the policy was delivered, the company's agent sold the insured additional insurance. No application was filled out for the second policy and, on April 4, the second policy was delivered, together with a photostatic copy of the original application and an amendment identical to the one involved here except, of course, that the substance of the matter amended was different. The insured died approximately two years thereafter, and the insurer refused to pay the benefits under either policy on the ground that the application for insurance and the amendment contained material misrepresentations.

The court held that a misrepresentation on the application for the first policy regarding consultation with a physician for a gall bladder attack was immaterial. As to the asserted misrepresentation in the application for the second policy, the insurer claimed that by signing the amendment the insured had stated that the representations made in the original application were true as of the amendment date. In reply to this argument the court stated:

"To the insured layman, the words of the amendment said that the application spoke as of its own date and also as of the date of the amendment. Alongside the application itself, the words of the amendment say, in effect, that the company is satisfied with the application of March 3, 1944, and that, on the basis of that application, the company is issuing additional insurance if the insured will authorize the application to be amended so as to apply for the additional policy.

because of some family problems. Such evidence cannot justify an inference that Devore falsified his original application, since there is no indication that Devore had ever visited a psychiatrist prior to the time the application was completed.

Nowhere is any inquiry made as to the changes of status since the date of the original application, nor is there any indication that the company wished any additional information. The insured could reasonably understand that the sum and substance of the amendment was that the company was merely increasing the amount of the insurance. This understanding is fortified by the testimony of Singer, the agent, who said without contradiction that no additional application or physical examination was made or required and the amendment was prepared by the company in its home office and forwarded with the second policy to him for delivery to the insured. . . .

". . . The insured could reasonably understand . . . that he was re-affirming the application as of its own date, and ratifying the statements then made for the purpose of increasing the amount of insurance issued thereon. The application amendment is not clear and unambiguous. . . . [I]t seems to be clear the insured had no desire or thought of misrepresentation of material facts, and, if the amended application had been clear, his conduct warrants the inference he would have made full disclosure as to his condition. . . .'' (90 N.E.2d at pp. 199-200.)

Metropolitan seeks to distinguish *Marshall*, contending that the decision was based on Illinois law, which requires an intent to deceive before a false representation in an application for insurance will void the policy, whereas in California the rule is otherwise. The argument is without merit. The opinion makes clear not only that under Illinois law an insurance policy will be defeated where a misrepresentation by the applicant affects the acceptance of the risk by the company, but also that disclosure of the insured's heart condition would have prevented issuance of the second policy.[3]

Another ground on which Metropolitan seeks to distinguish *Marshall* is equally untenable. The substance of the amendment involved in *Marshall* provided that it was made "without affecting" the original application's use for the first policy. Metropolitan suggests that the decision holds the amendment to be ambiguous because the words "without affecting" are unclear. However, the opinion quotes the last sentence of

[3]At pages 196-197 of 90 N.E.2d the court quotes section 154 of the Illinois Insurance Code (Ill. Rev. Stat. 1947, ch. 73, par. 766) which then provided, "No . . . misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company."

the amendment, which is identical with the language in the present case, states that the controversy revolves around this sentence, and does not mention the words "without affecting" in the course of the discussion of ambiguity. (90 N.E.2d at pp. 199-200.)[4]

■ The rationale of *Marshall* is, of course, adaptable here. The purpose of the amendment in the present case was to add to, change, or clarify the application in several respects rather than to inquire about Devore's condition subsequent to the time of the original application.[5] Under the circumstances, Devore could have reasonably concluded that the language in question meant that, although he was making changes in the application in the respects noted, he reaffirmed the other answers given on the original application as of the dates he made them. Here, as in *Marshall*, the insured was asked no questions regarding any change in his medical history since the date of the original application.

In view of the settled rule that all ambiguities must be interpreted against the insurer (*California Comp. & Fire Co.* v. *Industrial Acc. Com.* (1965) 62 Cal.2d 532, 534 [42 Cal. Rptr. 845, 399 P.2d 381] ; *Freedman* v. *Queen Ins. Co.* (1961) 56 Cal.2d 454, 456 [15 Cal.Rptr. 69, 364 P.2d 245]), we hold that, in signing the amendment, Devore merely represented that he reaffirmed the answers given on his prior application as of the time they were made in September. It is thus unnecessary to decide whether the alleged misrepresentations were material to the risk.

[4]One other case has been found, not cited by the parties, interpreting the word "hereof" in an application for insurance. In *Baugh* v. *Metropolitan Life Ins. Co.* (1938) 173 Tenn. 352 [117 S.W.2d 742], an insured was covered by a group life insurance policy issued in 1923. In 1928, he converted the group policy to an individual policy after filling out an application. The application stated that if the insured committed suicide "within one year from the date of issue hereof" the company would not be liable to pay death benefits. The insured killed himself within one year from the date of the application, and the court held that the beneficiary under the policy could recover. It was reasoned that the word "hereof" in the quoted phrase was ambiguous since it must have referred to the contract of insurance and the contract consisted of several documents, including the application itself, dated 1928, and other documents, dated 1923. The court concluded that the date of issue should, therefore, be deemed the 1923 date rather than 1928.

[5]Metropolitan had determined to issue an intermediate policy at a higher premium and wished to have the original application amended to reflect this. The reason for the insertion of the statement that Devore had not been associated with persons suffering from tuberculosis was that the medical examiner had failed to ask Devore this question at the time of the examination. In addition, Devore was asked in the amendment to state the amount of insurance for which he applied because someone had written over the figures in his answer in the original application form.

▊ Metropolitan contends that, even if the amendment is ambiguous, we must find that a misrepresentation occurred as a matter of law. It relies on section 356 of the Insurance Code which provides, ''The completion of the contract of insurance is the time to which a representation must be presumed to refer.'' It is urged that the contract here was not completed until delivery and that, since the representations in the original application are, by the terms of section 356, deemed to be made at the time of completion of the contract, Devore must be held as a matter of law to have answered the questions falsely. We hold, however, that the presumption is rebuttable, and if, as here, the trial court finds as a fact that the representations were referable to an earlier time, the date of the application in September 1959, this conclusion is controlling.

▊ We next reach the question whether the contract of insurance ever became effective because Metropolitan insists that when the policy was delivered on November 30, Devore was no longer insurable. It will be recalled that the application provides that Metropolitan shall incur no liability until a policy has been delivered and the premium paid during the continued insurability of the applicant.

*Brubaker* v. *Beneficial etc. Life Ins. Co.* (1955) 130 Cal. App.2d 340 [278 P.2d 966], guides us in construing a provision of this type.[6] In *Brubaker,* the insured applied for a policy in March 1952. The application stated that the policy issued should not take effect unless and until the full first premium had been paid and the policy delivered to the insured during his ''good health.'' The company issued a policy, which was delivered on April 11. Subsequently, it was discovered that the insured had cancer, a condition which antedated the application for and delivery of the policy. The insurance company claimed that the delivery of the policy during the good health of the insured was a condition precedent to its liability, and that this condition was not met.

The court in *Brubaker* adopted the view prevailing in a majority of jurisdictions that the insurer, having the ad-

[6]Both parties cite and quote from *American Nat. Ins. Co.* v. *Herrera* (1963) 211 Cal.App.2d 793 [27 Cal.Rptr. 641], but distinguish it from the present case on the ground that the rule stated there relates to a situation where the insurer does not require the applicant to submit to a medical examination. The *Herrera* case itself distinguishes *Brubaker* on this ground, and the discussion which follows will be confined to a situation in which, as here, the insurer's doctor examines the applicant prior to the issuance of the policy.

vantage of a medical examination and dealing with an insured apparently in good health and acting in good faith, will not be permitted to avoid the contract if it should develop after delivery of the policy that the insured had actually been afflicted with serious pathology. The opinion states, ''The majority of the cases . . . have taken the position that such a provision relates only to changes in the condition of the insured occurring after the making or acceptance of the application for the policy and before its date, issuance, or delivery, at least where in connection with the application there was an examination of the insured by a physician representing the insurer.'' (130 Cal.App.2d at p. 345.) The court concluded that it would be unfair to hold a policy void where an insured had complied with every provision of the contract merely because lurking undetected within his anatomy was some pathology which would in the future prove fatal.

Metropolitan concedes that California follows the majority rule and that no difference in result here would be justified merely because the words ''continued insurability'' rather than ''continued good health'' are used in the policy.

The parties are at odds, however, regarding application of the *Brubaker* rule. Metropolitan contends that Devore's good health changed in the interval between the time he applied for the policy and its delivery, because he was diagnosed as suffering from arteriosclerotic heart disease, whereas Mrs. Devore claims that there was no change during that period because his heart disease, if any, antedated the time of application.

Metropolitan's position is sound in this instance. The ''change'' in the *Brubaker* rule refers to a change of the health of the insured which has manifested itself before the time of delivery. Although in that case the disease antedated the application for the policy, the court's holding was based on the fact that the seriousness of the insured's illness was not evident until after the policy had been delivered. Other cases following the majority rule also turn on the question whether the ''change'' in health became manifest before delivery or issuance, and factually they involved situations, like *Brubaker*, in which the insured's disease actually existed before issuance or delivery of the policy. (See, e.g., *Liberty etc. Life Ins. Co.* v. *Hopkins* (1962) 106 Ga.App. 829 [128 S.E.2d 339] ; *Minzenberg* v. *Metropolitan Life Ins. Co.* (1945)

157 Pa.Super. 557 [43 A.2d 377] ; *Germano* v. *Home Life Ins. Co.* (1939) 135 Pa.Super. 208 [5 A.2d 449].)

In the present case, there can be no doubt that before delivery of the policy Devore's doctor determined he was suffering from arteriosclerotic heart disease. That the diagnosis indicated some change in Devore's physical condition, i.e., the manifestation of a previously latent disease, cannot be doubted.[7] However, the trial court also found that at the time the policy was delivered Devore considered himself to be in good health and had no knowledge of any condition such as would lead him or any reasonable person to believe his life or health was endangered. Metropolitan argues that the "continued insurability" clause of the policy operates to avoid liability even if Devore was not aware of any change in his health. No authority is cited except for the distinguishable cases mentioned in the margin, holding that an insurer may rely on such a provision if the insured himself is not aware that his health has materially worsened between the time of application and delivery although a stranger to the contract of insurance has acquired such knowledge.[8] One case from a jurisdiction following the majority rule involved a situation in which a physician, between the time of application and delivery, determined that the insured was suffering from heart disease but did not communicate this fact to him. (*Madsen* v. *Metropolitan Life Ins. Co.* (1959) 90 R.I. 176 [156 A.2d 203].)

---

[7]We need not discuss Mrs. Devore's contention that Devore's heart condition was so mild that it could not be viewed as constituting a material change in his health. As shall appear, we conclude that the "good health" clause is applicable only where the insured himself has knowledge that his good health has been materially affected in the interim between application and delivery, and here the evidence supports the trial court's conclusion that Devore did not have such knowledge. It may also be noted that the trial court found that there was no material change in Devore's condition between application and delivery. This finding appears to be based on the fact that whatever heart disease Devore suffered from antedated the time of his application.

[8]Although Metropolitan purports to cite a number of cases for this view, they all involved jurisdictions in which the minority rule was followed, requiring the insured to actually be in good health on the day of issuance or delivery. (*Mutual Trust Life Ins. Co.* v. *Ossen* (2d Cir. 1935) 77 F.2d 317; *Gallant* v. *Metropolitan Life Ins. Co.* (1896) 167 Mass. 79 [44 N.E. 1073]; *Holloway* v. *Metropolitan Life Ins. Co.* (1915) 90 Misc. 697 [154 N.Y.Supp. 194]; *Ellis* v. *Capital Life & Health Ins. Co.* (1956) 229 S.C. 388 [93 S.E.2d 118]; *Life & Casualty Ins. Co.* v. *Runnion* (1935) 20 Tenn.App. 13 [94 S.W.2d 405].) Obviously, where this is the rule, the knowledge of the insured is immaterial. Also cited is language in *American Nat. Ins. Co.* v. *Herrera, supra,* 211 Cal.App.2d 793, a case which, as already stated, both parties treat as distinguishable. (See fn. 6, p. 129.)

It was there held that the insurer could not rely on a "good health" provision because the *insured* had no knowledge of his heart ailment prior to the time the policy was delivered.

It is clear from the reasoning employed in *Brubaker* that the purpose of the majority rule is to prevent the insurer from relying on the "good health" provision where an applicant for insurance believes in good faith that he is healthy on the effective date of the policy. It is patently unfair to charge him with the uncommunicated knowledge of a third person under such circumstances. ▉ In sum, a "good health" provision does not bar recovery where the applicant believes in good faith that his health has not materially changed between the time of application and delivery. However, he cannot rely on the fact that a disease predated the application where the latent condition becomes manifest before delivery and he has knowledge of its seriousness.

▉ Metropolitan then contends that, even if Devore's own knowledge of the state of his health is material, the evidence does not support the trial court's finding that Devore did not believe and had no reasonable cause to believe that there had been a material change in his good health. The testimony in the present case, when viewed in the light most favorable to the trial court's findings, indicates the following:

Devore consulted Dr. Thorner on October 10, 1959, for the purpose of a routine examination, pursuant to his practice to undergo regular physical checkups. At the October 10 visit Dr. Thorner found no evidence of disease and an electrocardiogram performed on that date was normal. However, Devore appeared to be nervous and, in answer to a question which the doctor routinely asked patients who came in for examination, Devore stated that he felt "a little pressure in the chest if he rushes." Devore returned on October 19 and, at that time, an electrocardiogram was performed after exercise. On the basis of this test the doctor made a diagnosis of arteriosclerotic heart disease secondary to coronary insufficiency. The condition was very mild. Although the doctor did not recall his specific statements to Devore, he routinely advised patients who were overweight, as Devore was, not to overeat and to avoid excitement and unusual physical exertion. He also told Devore that he had mild hardening of the arteries (a condition which in the doctor's opinion did not indicate serious heart disease) and that he should go into the hospital for rest and medication to prevent trouble. In the hospital, Devore was placed on a medicine known as Dicumerol which,

he was told, was prescribed to "thin his blood." Electrocardiograms performed during his hospital stay and thereafter were normal.

In a deposition given by Devore before his death and introduced into evidence, he stated that Dr. Thorner had told him the October 19 electrocardiogram was a little different from the previous one, conveying the idea that it was not a normal test, and that he needed a complete rest. While he was in the hospital Dr. Thorner told him that he had a little hardening of the arteries. Mrs. Devore testified that during her husband's hospital stay he did not complain of any difficulties and conducted his business affairs from the telephone in the hospital corridor. After discharge, he continued under the care of Dr. Thorner, visiting him about once a week for the first month and less frequently thereafter. He continued to take Dicumerol. He worked a regular eight-to-ten-hour day, appeared vigorous and healthy, and remained active in various civic organizations until the day of his death more than two years later.

We cannot say that the evidence is insufficient to support the trial court's finding that Devore could reasonably believe that he was in good health and insurable at the time the policy was delivered to him.

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Burke, J., and Peek, J.,* concurred.

McCOMB, J.—I dissent. I would reverse the judgment for the reasons expressed by Mr. Justice Frampton** in the opinion prepared by him for the Court of Appeal in *Metropolitan Life Insurance Co.* v. *Devore* (Cal.App.) 51 Cal.Rptr. 331.

Appellant's petition for a rehearing was denied April 5, 1967.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

**Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.