**NEW ENGLAND LIFE INSURANCE CO., Plaintiff,**

v.

**Raymond E. SIGNORELLO, Jr., Defendant.**

**Raymond E. Signorello, Jr., Counter-claimant,**

v.

**New England Life Insurance Co., Counter-defendant.**

**No. C 99–4297 MHP.**

United States District Court, N.D. California.

Sept. 7, 2000.

James H. Fleming, Fleming & Phillips, Walnut Creek, CA, for New England Life Insurance Co.

Ray Bourhis, Jill K. Schlichtmann, Alice J. Wolfson, Bourhis Wolfson & Schlichtmann, San Francisco, CA, for Raymond E. Signorello, Jr.

## MEMORANDUM AND ORDER

PATEL, Chief Judge.

On September 20, 1999, New England Life Insurance Company ("New England") filed this action against Raymond E. Signorello, Jr. ("Signorello, Jr.") seeking recission and declaratory relief. In his amended counterclaim, Signorello, Jr. alleges breach of contract, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, negligent misrepresentation and intentional misrepresentation.

Now before the court is New England's motion for summary judgment. Having considered the parties' arguments and for the reasons set forth below, the court enters the following memorandum and order.

## BACKGROUND

New England received an application dated August 15, 1997, for a $500,000 life insurance policy naming Raymond E. Signorello, Sr. ("Signorello, Sr.") as the proposed insured and Signorello, Jr. as the owner and beneficiary. No money was submitted with the application.

The application provides the following Declaration:

> **When Insurance Takes Effect.** If a prepayment is made in connection with this Application, the insurance will take effect as stated in the Prepayment Receipt and Temporary Insurance Agreement. Otherwise, the insurance will take effect only when the first premium is paid; provided that at the time of such payment: (a) this Application has been approved by the Company at 501 Boylston Street, Boston, MA; and (b) there has been no change in insurability as represented in this Application since the date of the Application.

Haddad Dec., Exh. A at 8.

On the application, Signorello, Sr. stated that he had been diagnosed with throat cancer in July 1991 and received "chemo-radiation" treatment. Signorello, Sr. identified the treating physician as Scott Dur-

ham, M.D., of Vancouver, B.C. Signorello, Sr. also stated that in July 1997, he consulted Mark Gelfer, M.D., of Vancouver, B.C. for a routine check-up. Signorello, Sr. confirmed this information in a telephone conversation with Connie Alunni, a representative of New England, on October 7, 1997.

On October 2, 1997, Wilson To of the San Francisco General Agency contacted the Home Office of New England. To requested an alternate plan of insurance for Signorello, Sr. in the amount of $1,000,-000. To also requested that the policy be back-dated to "save age." According to New England, back-dating a policy to "save age" means providing an earlier effective date in cases where a change in the age of the proposed insured during the underwriting process would otherwise cause an increased premium. (Despite To's request, New England initially issued the policy on December 2, 1997 without back-dating the policy to save age. On December 9, 1997, New England reissued the policy and back-dated the policy to September 21, 1997.)

As part of the underwriting process, New England ordered copies of the records of Signorello, Sr.'s personal physician, Dr. Gelfer. Dr. Gelfer's records indicated that he had last seen Signorello, Sr. on October 6, 1997, and had prescribed medication for high blood pressure. Dr. Gelfer's records did not mention any new or recurrent cancer as of that date.

At the request of New England, Patricia Urbina, M.D., examined Signorello, Sr. on October 10, 1997. Signorello, Sr. informed Dr. Urbina that he recently had seen Dr. Gelfer, who prescribed medication for elevated blood pressure. Signorello, Sr. advised Dr. Urbina that he lost 10–15 pounds during the previous year.

On October 31, 1997, Michelle M. Haddad, an Underwriting Consultant for New England, decided that a policy could be issued to Signorello, Sr. at an increased premium. Haddad notified the San Francisco General Agency of the proposed premium rating. Haddad finalized the premium rating and approved the issuance of the policy at the increased premium on December 2, 1997. She notified Signorello, Sr. by letter on December 16, 1997, that the policy issued at an increased premium due to his history of throat cancer.

While the policy application was pending, Signorello, Sr. was diagnosed with esophageal cancer. On October 27, 1997, Signorello, Sr. was examined by Edward Share, M.D., at Cedars–Sinai Medical Center in Los Angeles. Dr. Share initially diagnosed him with a thickening of the esophageal wall and recommended dilating his esophagus. During the procedure, Dr. Share discovered a tumor in the esophagus and ordered a biopsy. The pathology report dated October 27, 1997, indicates adenocarcinoma of the esophagus. Dr. Gelfer, Signorello, Sr.'s personal physician, was informed of the cancer diagnosis on either October 29 or 30, 1997.[1]

Signorello, Sr. saw Gregory Sarna, M.D., a medical oncologist at Cedars–Sinai, on October 30, 1997. Dr. Sarna stated that Signorello, Sr. had "a GE junction adenocarcinoma which is dominantly in the esophagus." Kearns Dec., Exh. P at 3. Dr. Sarna concluded that Signorello, Sr. was not a surgical candidate and instead recommended chemotherapy. Signorello, Sr. began palliative chemotherapy at Cedars–Sinai on November 5, 1997. Signorello, Sr. returned to his home in Vancouver, British Columbia in early November 1997 and resumed treatment at the British Columbia Cancer Agency. One of his treating physicians in Vancouver, D.J. Klassen, M.D., saw Signorello, Sr. on November 13, 1997. Dr. Klassen reported that Signorello, Sr. "knows that the best we can expect is about a 30–35% chance of controlling his .

---

1. Dr. Gelfer's records indicate that he was informed of the cancer diagnosis on October 6, 1997. *See* Kearns Dec., Exh. I at 2. At his deposition, however, he testified that he subsequently corrected his records to show that he was notified of the diagnosis on October 29 or 30, 1997. Fleming Dec., Exh. G at 14.

cancer with chemotherapy, that this is not curative and that the average length of control is about six months." Kerns Dec., Exh. L at 4. Signorello, Sr. told Signorello, Jr. about the diagnosis in December 1997.

Signorello, Sr. died on November 12, 1998 of cardiac arrest due to acute renal failure. The death certificate indicates that Signorello, Sr. was also suffering from carcinoma of the gastro-esophageal junction. After his father's death, Signorello, Jr. submitted a Beneficiary's Statement and a copy of the death certificate to New England on or about December 17, 1998.

Stephanie Williams, an agent in New England's Claims Department, commenced an investigation of Signorello., Jr.'s claim upon receipt of the Beneficiary's Statement. According to New England, the company routinely conducts a "contestable claim investigation" to determine whether any misstatements have been made in the application in cases where, as here, the insured dies less than two years after the policy issue date. In connection with the contestable claim investigation, New England reviewed statements of Dwight Mathiason, the agent who wrote the policy, and Signorello, Jr., as well as records of Signorello, Sr.'s medical treatment at Vancouver Hospital, British Columbia Cancer Center and Cedars–Sinai Medical Center. New England learned of Signorello, Sr.'s 1997 cancer diagnosis during the contestable claim investigation.

Williams prepared a contestable claim referral for the underwriter to determine whether the information discovered during the investigation would have affected the decision regarding Signorello, Sr.'s insurability as of December 1, 1997, the approximate date of delivery of the policy. The underwriter responded that it would have declined to issue the policy on the basis of the October 1997 diagnosis.

Maureen Kearns, a Senior Consultant in New England's Claims Department, notified Signorello, Jr. by letter that the policy was being rescinded. Kearns enclosed a check for $41,414.63 to refund all premiums, plus interest. Signorello, Jr. did not endorse the check. New England then filed this action for declaratory relief and recission. Signorello, Jr. counterclaimed[2] alleging breach of contract, breach of the covenant of good faith and fair dealing, intentional misrepresentation and negligent misrepresentation. Now before the court is New England's motion for summary judgment.

*LEGAL STANDARD*

Summary judgment shall be granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. 56(c). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions' on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party discharges its burden by showing that the nonmoving party has not disclosed the existence of any "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The court does not make credibility determinations in considering a motion for summary judgment. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Rather, it views the inferences drawn from the facts in the light most

---

2. Signorello, Jr. titles his pleading a "Cross Complaint." A cross-claim is a claim by one party against a co-party. *See* Fed.R.Civ.P.

13(g). Signorello, Jr. has filed a counterclaim against New England. *See* Fed.R.Civ.P. 14(a) (defining "compulsory counterclaim").

favorable to the party opposing the motion. *See T.W. Electical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir.1987).

## DISCUSSION

### I. *The Contract*

At the outset, the court must address New England's contention that no contract exists between New England and Signorello, Jr. New England points to Signorello, Jr.'s statement appearing in his declaration that he has no recollection of reading the provision of the application regarding changes in insurability. Signorello, Jr. states, "In fact, I am unsure as to whether I ever saw the application prior to this litigation since the signature under the heading 'Applicant if [O]ther than Proposed Insured' does not look like my regular signature." Signorello, Jr. Dec. ¶ 8.

■ New England has raised a genuine issue of fact regarding the existence of a contract between these parties. Generally, failure to sign the application precludes the making of a binding contract because there is no meeting of the minds. *See* 43 Am.Jur.2d Insurance § 200 (1982). There are exceptions to this rule. For example, a policy signed by a third person at the direction of the party and subsequently ratified by the party may be enforceable. *See id.* The contract in this case may be enforceable if a third person signed at Signorello, Jr.'s direction and he subsequently ratified the policy.

■ The record suggests that Signorello, Sr. signed his son's name to the application. Dwight Mathiasen, the agent who sold the Signorello policy, states in his declaration that he mailed the application

to Signorello, Sr.'s home in Vancouver and received the signed application from Signorello, Sr. Mathiasen Dec. ¶ 3. In addition, the signature purporting to be that of Signorello, Jr. has the notation "RS" above it. Nothing in the record, however, indicates that Signorello, Jr. directed his father to sign his name to the application. In light of this failure of proof, the court cannot conclude that a contract exists between the parties. Even if a contract exists, however, New England is entitled to summary judgment for the reasons discussed below.

### II. *"Change in Insurability"*

Assuming a contract exists between the parties, no insurance came into effect because a condition precedent to the issuance of insurance failed. In accordance with the change in insurability provision of the application, if no prepayment was submitted with the application, the insurance would take effect only when the first premium was paid; provided that at the time of such payment: (a) New England had approved the application; and (b) there had been no change in insurability as represented in the application since the date of the application. *See* Haddad Dec., Exh. B at 8. The application was dated August 15, 1997. Joint Statement of Undisputed Material Fact ("UMF") ¶ 1. The first premium for the policy was paid by check on November 20, 1997. UMF ¶ 15; Fleming Dec., Exh. B. The insurance would thus take effect on November 20, 1997, provided that at the time of payment New England had approved the application and there had been no change in insurability since August 15, 1997.[3] Signorello, Sr.'s

---

**3.** Signorello, Jr. argues that even if the change in insurability provision is enforceable, the condition was satisfied because the change in Signorello Sr.'s insurability occurred after the company approved the policy. *See* Signorello, Jr.'s Opp. to Mot. for Summ. J. at 17–18. · He relies on *Wanshura v. State Farm Life Ins. Co.*, 275 N.W.2d 559 (Minn.1978), and *Rogers v. Great–West Life Assur. Co.*, 48 F.Supp. 86 (D.Minn.1942), for the proposition that the date of approval of the policy controls the application of the

change in insurability provision. This argument is unavailing. These cases apply Minnesota law and are not controlling here. Moreover, the change in insurability provision of the application in this case specifies that the policy takes effect only when the first premium is paid "provided that at the time of such payment" the application has been approved and there has been no change in insurability between the date of the application and the date of payment. Haddad Dec., Exh. A at 8.

tumor was discovered and biopsied on October 27, 1997. UMF ¶ 33; Kearns Dec. ¶ 15, Exh. O & P. Signorello, Sr.'s October 1997 cancer diagnosis was a material change in his health and therefore constitutes a change in insurability. This change in insurability precludes coverage under the policy.

The court rejects Signorello, Jr.'s contention that the change in insurability provision of the application is unenforceable. First, Signorello, Jr. maintains that the provision is unenforceable because the application was not appended to the policy he received from Mathiasen. Signorello Dec. ¶ 8. He declares, "I have searched my files and have discovered no copy of the application attached to the policy or otherwise in my possession." *Id.* In addition, Mathiasen has submitted a declaration stating that he cannot recall whether the application was attached to the policy when he delivered the policy on November 20, 1997.[4] Mathiasen Dec. ¶ 6; *see also id.* at ¶ 3. Signorello, Jr. reasons that the application was never "appended [to the policy]—if it had been, it would still be appended to it." Signorello, Jr.'s Opp. to Summ. J. at 13. Signorello, Jr.'s argument is undermined by his own admission at his deposition that he could not account for the original insurance policy and could not authenticate the accuracy of his copy. *See* Fleming Supp. Dec., Exh. A at 8:6–10:22. This evidence raises the inference that Signorello, Jr., never had the original policy in his possession. Moreover, New England proffers the declaration of Ronald I. Becker, a Second Vice President in New Business Services Administration for New England, describing the company's "two-step process" to ensure that "all required forms and provisions, particularly including a copy of the application, are made a part of the policies."[5] Becker Dec. ¶ 3.

■ Second, Signorello, Jr. argues that the change in insurability provision is unenforceable because it is inconspicuous. Signorello, Jr. states that Mathiasen did not bring the clause to his attention or advise him of an obligation to notify New England of any change in his father's health. Signorello, Jr. Dec. ¶ 8; *accord* Mathiasen Dec. ¶ 6 (declaring that Mathiasen did not notify the Signorellos of the change in insurability provision or explain the effect of a change in health). A review of the application refutes this argument. *See* Haddad Dec., Exh. A at 8. The provision appears on the last page of the application above the signature block. The heading "When Insurance Takes Effect" is printed in bold. The short paragraph states that insurance will take effect upon payment of the first premium if the company has approved the application and if there has been no change in insurability. Signorello, Jr. is bound by the conspicuous provisions of the document he signed. *See Lunardi v. Great–West Life Assurance Co.*, 37 Cal.App.4th 807, 820, 44 Cal. Rptr.2d 56 (1995) (upholding good health provision where owners/insureds did not review the application and the agent did not point out the relevant paragraph).

4. New England contends that Mathiasen could not have delivered the policy to Signorello, Jr. on November 20, 1997 because the policy was issued on December 9, 1997. *See* Kellerman Dec. ¶ 5. The company notes the agency sent a copy of a policy illustration to New England on November 20, 1997. New England's Reply at 3; *see also* Kellerman Dec., Exh. D. New England suggests that the illustration, not the policy, was delivered on November 20, 1997. *Id.*

5. According to Becker, the underwriter first electronically orders the policy output after approval of issuance. Becker Dec. ¶ 3. The computer-generated output is then transmitted to the Policy Issue Unit in the New Business Department. *Id.* An agent in that unit matches the output to the underwriting file and photocopies the application. *Id.* The agent then binds these materials and sends the policy to another person in the Policy Issue Unit for quality review to ensure that the policy includes all relevant provisions and has a copy of the application attached. On the basis of 20 years of experience, Becker states that New England has "never had a policy returned because the application was missing." *Id.*

Third, Signorello, Jr. insists that the provision is unenforceable because it is ambiguous. Signorello, Jr. states in his declaration that if he had read the provision before purchasing the policy, he would not have understood it. He explains, "I do not know the meaning of a 'change in insurability'; insurability is not a word that I have ever used." Signorello, Jr. Dec. ¶ 8. To support his contention, Signorello, Jr. offers the statement of Dwight Mathiasen that he too found the provision "vague and confusing" even though he had read the application many times. *See* Mathiasen Dec. ¶ 6. Signorello's current belief that he would not have understood the meaning of the change in insurability provision is insufficient to defeat New England's motion for summary judgment. Although Signorello, Jr. might have found the term "insurability" unfamiliar, the context clarifies the meaning of the term. The application requests detailed medical and personal information. In fact, most of the information sought is medical information. The change in insurability provision follows immediately after a declaration affirming that the answers recorded on the application are true and complete. *See* Haddad Dec., Exh. B. The provision makes clear that insurance will take effect only if there has been no change in insurability as represented in the application since the date of the application. Given the nature and extent of the medical information sought on the application and the fact that little of the other information would be likely to change, it is difficult to understand what other information could refer to insurability. The only reasonable interpretation of the term "insurability" is that it refers to medical condition.

Moreover, the California Supreme Court has enforced a similar provision. In *Metropolitan Life Ins. Co. v. Devore*, 66 Cal.2d 129, 56 Cal.Rptr. 881, 424 P.2d 321 (Cal. 1967), the court upheld a life insurance application that provided no liability "until a policy has been delivered and the full first premium ... has actually been paid to and accepted by the Company during the lifetime and *continued insurability* of

the applicant ...." 66 Cal.2d at 131, 56 Cal.Rptr. 881, 424 P.2d 321 (emphasis added). The change in insurability provision is enforceable.

Signorello, Jr. argues that even if the October 1997 cancer diagnosis amounted to a change in insurability, he did not breach a duty to disclose the information to New England because he did not learn of the diagnosis until December 1997. Signorello, Jr. maintains that he, not his father, owed a duty to New England to inform the company about any changes in his father's health. He relies on language from the California Supreme Court in *Devore* that the state of mind of the *applicant*, rather than the proposed insured, determines the enforceability of the change in insurability provision. In *Devore*, the court held that a good health provision "does not bar recovery where the *applicant* believes in good faith that his health has not materially changed between the application and delivery." *Devore*, 66 Cal.2d at 140, 56 Cal.Rptr. 881, 424 P.2d 321 (emphasis supplied). Signorello, Jr. reads *Devore* too narrowly. In *Devore*, the decedent was the applicant and the proposed insured. *Id.* at 131, 56 Cal.Rptr. 881, 424 P.2d 321.

In essence, Signorello, Jr. asks the court to hold that only the applicant bears the burden to disclose to the insurance company any material changes in the insured's health. This reasoning is flawed for two reasons. First, both Signorello, Sr., the proposed insured, and Signorello, Jr., the owner of the policy, signed the application containing the change in insurability provision. The application asks detailed questions about the insured's health and the policy would have covered the life of the proposed insured. As a policy matter, relieving the duty of the insured to disclose material information about his own health would fundamentally alter the risk assumed by the insurance company. Second, the condition precedent to coverage is not *notification* of the insurer regarding a change in health but the *manifestation* of

such a change. The condition precedent to coverage failed once Signorello, Sr. was diagnosed with cancer of the esophagus.

■ Signorello, Jr. next contends that New England waived the change in insurability provision because the company failed to detect the new cancer on its own during Dr. Urbina's examination on October 10, 1997. He insists that New England neglected to investigate further his father's weight loss, elevated blood pressure and prior history of cancer. Signorello, Jr. assumes that such an investigation would have revealed his father's esophageal cancer. This argument lacks merit. In *Lunardi*, as in this case, the proposed insured's condition was not revealed during the prerequisite medical examination but was diagnosed by the insured's private physician while the application was pending. *See* 37 Cal.App.4th at 821, 44 Cal. Rptr.2d 56. The *Lunardi* court rejected plaintiffs' argument that the good health provision was inapplicable to a condition that could have been detected in the medical examination. *Id.* at 823, 44 Cal.Rptr.2d 56. Signorello, Jr. cannot avoid application of the change in insurability provision simply because New England did not detect the cancer. The change in insurability provision is enforceable and operates to preclude insurance in this case. New England is entitled to summary judgment because no insurance took effect under the policy.

Even if the change in insurability provision were not enforceable, New England would be entitled to recission of the policy. Under California law, a material misrepresentation or concealment entitles the injured party to recission of an insurance contract. *See* Cal. Ins.Code § 331; Witkin, *Summary of California Law* (9th ed.1987) § 415. "Neglect to communicate that which the party knows, and ought to communicate, is concealment." Cal. Ins. Code § 330. In *Lunardi*, the court concluded that the owner and the proposed insured concealed the proposed insured's diagnosis of acute myelogenous leukemia in violation of the California statute. *See*

*Lunardi*, 37 Cal.App.4th at 825–26, 44 Cal. Rptr.2d 56. Signorello, Sr. concealed from New England his 1997 cancer diagnosis.

The effect of this concealment turns on the materiality of the information withheld. Materiality is determined by the "probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." Cal. Ins.Code § 334. New England proffers the declaration of Michelle Haddad, an Underwriting Consultant, that she would not have approved insurance for Signorello, Sr. if she had known that he had been diagnosed with esophageal cancer or was receiving chemotherapy treatment. Haddad Dec. ¶ 10. Haddad also states that she would have classified Signorello, Sr.'s cancer as Class AO pursuant to the 1997 New England Underwriting Manual, which requires that applicants with such tumors less than ten years old be declined for insurance. *Id.* at ¶ 11. On the basis of Signorello, Sr.'s concealment of material information, New England is entitled to recission.

### III. *Signorello, Jr.'s Counterclaims*

Signorello, Jr. filed causes of action for breach of contract, breach of the covenant of good faith and fair dealing, intentional misrepresentation, and intentional infliction of emotional distress on the basis of New England's denial of benefits under the Signorello policy.

### A. *First Cause of Action (Breach of Contract)*

In his first cause of action, Signorello, Jr. alleges breach of contract on the basis of New England's failure to pay death benefits owed under the contract. Amended Counterclaim ¶¶ 3–10. The change in Signorello, Sr.'s insurability is fatal to Signorello, Jr.'s counterclaim for breach of contract. New England did not owe a duty to pay benefits upon Signorello, Sr.'s death because the insurance policy never took effect. Under these circumstances,

Signorello, Jr.'s, claim for breach of contract fails as a matter of law.

### B. Second Cause of Action (Breach of the Covenant of Good Faith and Fair Dealing)

■ Signorello, Jr. alleges that New England's failure to pay benefits upon the death of the insured constituted breach of the implied covenant of good faith and fair dealing. An insurance company is liable for breach of the implied covenant if it unreasonably refuses a claim for benefits. *See Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1622, 50 Cal.Rptr.2d 224 (1996). New England did not act unreasonably in declining the claim because a condition precedent to the contract, the continued insurability of Signorello, Sr., failed. Consequently, New England is entitled to summary judgment on Signorello, Jr.'s claim for breach of the implied covenant of good faith and fair dealing.

### C. Third Cause of Action (Intentional Misrepresentation)

Signorello, Jr. brings a cause of action for intentional misrepresentation against New England. He alleges that New England promised "in the event of certain contingencies" to pay him $1,000,000 upon his father's death. Counterclaim ¶ 22. Signorello, Jr. avers, "Said representations of material fact were false, in that [New England] did not intend to pay such monies, notwithstanding [Signorello, Jr.'s] entitlement thereto, pursuant to the policy and the laws of California." Counterclaim ¶ 23. It is clear to the court that Signorello, Jr. anchors his counterclaim for intentional misrepresentation in a promise by New England to pay benefits. This representation,[6] however, was contingent on Signorello, Sr.'s continued insurability at the time of payment. As stated above, the condition precedent failed and the insurance, including the promise to pay benefits, never took effect. Signorello, Jr.'s

counterclaim for intentional misrepresentation fails as a matter of law.

### D. Fourth Cause of Action (Intentional Infliction of Emotional Distress)

In his fourth cause of action, Signorello, Jr. alleges intentional infliction of emotional distress on the basis of New England's denial of his claim for benefits. Counterclaim ¶¶ 30–39. One element of the tort of intentional infliction of emotional distress is extreme and outrageous conduct by the defendant. *See SimTel Communications v. National Broadcasting Co.*, 71 Cal. App.4th 1066, 1087, 84 Cal.Rptr.2d 329 (1999). In light of the court's finding that coverage never took effect, Signorello, Jr. cannot prove that New England's denial of his request for benefits amounted to outrageous conduct. The company's denial of benefits on a policy that never took effect was entirely reasonable. New England is entitled to summary judgment as to Signorello, Jr.'s counterclaim for intentional infliction of emotional distress.

### CONCLUSION

For the foregoing reasons, the court hereby GRANTS New England's motion for summary judgment as to its claims for recission and declaratory relief and as to Signorello, Jr.'s counterclaims for breach of contract, breach of the implied duty of good faith and fair dealing, intentional misrepresentation and intentional infliction of emotional distress.

IT IS SO ORDERED.

---

**6.** Ironically, Signorello, Jr. is quick to label New England's conditional promise to pay benefits a "misrepresentation" but he fails to recognize that the concealment from New England of the material change in his father's health bears the hallmark of misrepresentation.